**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                       :
In re:                                                 :    Chapter 11
                                                       :
CRP-2 Holdings AA, L.P.,                                :    Case No. 15-24683 (DRC)
                                                       :
                                                       :
                          Debtor.[1]                    :
                                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN OF**
**REORGANIZATION OF CRP-2 HOLDINGS AA, L.P. PURSUANT TO CHAPTER 11**
**OF THE BANKRUPTCY CODE**

Joseph Frank
Frances Gecker
FrankGecker LLP
325 N. LaSalle St.
Suite 625
Chicago, Illinois 60654
(312) 276-1400

Counsel for the Debtor and Debtor-in-Possession

Dated:   July 21, 2015
         Chicago, Illinois

> THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1125(a).   THE DEBTOR RESERVES THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT AT OR BEFORE THE HEARING TO CONSIDER THIS PROPOSED DISCLOSURE STATEMENT.

---

[1]   The last four digits of the Debtor's taxpayer identification number are 3709.  The location of the Debtor's corporate headquarters is Two International Place, Suite 2500-AA, Boston, MA 02110.

## INTRODUCTION AND DISCLAIMER

CRP-2 Holdings AA, L.P. ("CRP" or the "Debtor") submits this Disclosure Statement to holders of claims and interests entitled to vote on the Plan of Reorganization of CRP-2 Holdings AA, L.P. Pursuant to Chapter 11 of the Bankruptcy Code, dated as of July 21, 2015, a copy of which is annexed hereto as Appendix A (the "Plan").[2]  The Disclosure Statement is to be used by each such person solely in connection with its evaluation of the Plan.  Use of this Disclosure Statement for any other purpose is not authorized.  No assertion of fact or conclusion of law contained herein shall be binding on any party other than the Debtor.

Significantly, the Plan contemplates payment in full of all creditors, including the outstanding obligations under the Secured Credit Facility (defined below).  Moreover, the Debtor believes there is significant equity value in its business.  The Debtor's owners are confident enough in this value that, as described in the Plan, they are prepared to infuse a minimum of $10,000,000 in additional equity into the Debtor and its operations, with additional possible investments of up to $30,000,000 in their sole and absolute discretion.

THE TABLE SET FORTH BELOW SUMMARIZES THE CLASSIFICATION AND TREATMENT OF ALL CLAIMS AGAINST AND INTERESTS IN THE DEBTOR.  FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE APPENDICES AND EXHIBITS THERETO IN THEIR ENTIRETY.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

| Description Of Claims Or Interests | Summary Of Treatment |
|---|---|
| **Administrative Claims** | An Administrative Claim is a claim for costs and expenses of administration of the chapter 11 case, including Professional Fee Claims.  Except as otherwise expressly provided for in the Plan, all Allowed Administrative Claims will be paid in full in cash on the Effective Date of the Plan.  However, any Allowed Administrative Claim based on a liability incurred by the Debtor in the ordinary course of business during the chapter 11 case, including costs and expenses incurred in the operation of the Debtor's commercial properties, may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement or customary payment terms, and Professional Fee Claims will be paid in accordance with an order of the Bankruptcy Court permitting such payment.<br><br>**Estimated Amount:**   N/A<br>**Estimated Recovery:**  100% |

---

[2]    All capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan.

| Description Of Claims Or Interests | Summary Of Treatment |
|---|---|
| **Priority Tax Claims** | A Priority Tax Claim is a claim of a governmental unit for taxes accorded priority in right of payment under section 507(a)(8) of the Bankruptcy Code. On the Effective Date, any holder of an Allowed Priority Tax Claim shall have its claim reinstated, which means that such holder's legal, equitable and contractual rights with respect to its Priority Tax Claim will be left unaltered and paid in the ordinary course, unless such holder and the Debtor agree to a different treatment.<br><br>**Estimated Amount:** $1,300,000<br>**Estimated Recovery:** 100% |
| **Class 1 – Other Priority Claims** | An Other Priority Claim is a claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code. The Debtor does not believe it has any such claims. To the extent any such claim is not paid in the ordinary course then as soon as reasonably practicable after the Effective Date, each holder of an Allowed Other Priority Claim will be paid in full in cash.<br><br>**Estimated Amount:** $0<br>**Estimated Recovery:** 100% |
| **Class 2 – Other Secured Claims** | An Other Secured Claim is any claim that is secured by a lien on the Debtor's property, or that is subject to setoff, other than a Secured Credit Facility Claim (defined below). The Debtor does not believe it has any such claims. On, or as soon as reasonably practicable after, the Effective Date, each Allowed Other Secured Claim will be reinstated.<br><br>**Estimated Amount:** $0<br>**Estimated Recovery:** 100% |
| **Class 3 – Secured Credit Facility Claims** | A Secured Credit Facility Claim is a claim outstanding under the Debtor's Existing Credit Agreement. On, or as soon as reasonably practicable after, the Effective Date, each holder of an Allowed Secured Credit Facility Claim shall receive its pro rata share of a restructured loan in the full face amount of all obligations outstanding under the Existing Credit Agreement. The terms of the restructured loan are contained in Exhibit A to the Plan. The restructured loan contemplates payment in full of the obligations under the Existing Credit Agreement, with interest.<br><br>**Estimated Amount:** $163,000,000<br>**Estimated Recovery:** 100% |
| **Class 4 – General Unsecured Claims** | A General Unsecured Claim means an unsecured claim or cause of action against the Debtor. This Class includes any claim other than an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, an Other Secured Claim, or a Secured Credit Facility Claim. This class is comprised primarily of trade and other vendors. Each holder of an Allowed General Unsecured Claim shall receive the full |

| Description Of Claims Or Interests | Summary Of Treatment |
|---|---|
| | amount of such claim, excluding interest, on the later of (a) the ninetieth day after the Effective Date or (b) the first Business Day after the ninetieth day after the Effective Date on which such Claim is Allowed.<br><br>**Estimated Amount:**    **$1,400,000**<br>**Estimated Recovery:**    **100%** |
| **Class 5 – GP Interests in the Debtor** | GP Interests means all general partnership interests in the Debtor held by the General Partner, CRP-2 Holdings GP-AA, LLC.  On the Effective Date, all GP Interests will be reinstated, subject and subordinate to the preferred equity to be issued to REIT (defined below) on account of its new money investment.<br><br>**Estimated Amount:**    **N/A**<br>**Estimated Recovery:**    **100%** |
| **Class 6 – LP Interests in the Debtor** | LP Interests means all limited partnership interests in the Debtor.  On the Effective Date, all LP Interests will be reinstated, subject and subordinate to the preferred equity to be issued to REIT on account of its new money investment.<br><br>**Estimated Amount:**    **N/A**<br>**Estimated Recovery:**    **100%** |

THE DEBTOR HAS PREPARED THIS PROPOSED DISCLOSURE STATEMENT PURSUANT TO BANKRUPTCY CODE SECTION 1125 FOR USE IN THE SOLICITATION OF VOTES ON THE PLAN.  FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, INCLUDING **SECTION IV — "RISK FACTORS TO BE CONSIDERED,"** THE PLAN, AND THE APPENDICES AND EXHIBITS HERETO AND THERETO IN THEIR ENTIRETY.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO THE SATISFACTION OR WAIVER OF MATERIAL CONDITIONS PRECEDENT.  THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS PRECEDENT WILL BE SATISFIED.  THE DEBTOR CURRENTLY INTENDS TO SEEK TO EFFECTUATE THE PLAN PROMPTLY AFTER CONFIRMATION OF THE PLAN.  THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE ACTUALLY WILL OCCUR. PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN, INCLUDING MATTERS THAT ARE EXPECTED TO AFFECT (A) THE TIMING OF THE RECEIPT OF DISTRIBUTIONS BY HOLDERS OF CLAIMS IN CERTAIN CLASSES AND (B) THE AMOUNT OF DISTRIBUTIONS ULTIMATELY RECEIVED BY SUCH HOLDERS ARE DESCRIBED IN **SECTION III — "SUMMARY OF THE PLAN OF REORGANIZATION."**  IF THE PLAN IS NOT CONFIRMED AND/OR EFFECTUATED, THEN THE DEBTOR WILL HAVE TO CONSIDER ALL OF ITS OPTIONS AS A DEBTOR IN BANKRUPTCY.

NO PERSON IS AUTHORIZED BY THE DEBTOR IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THIS DISCLOSURE STATEMENT OR THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE APPENDICES ATTACHED HERETO OR INCORPORATED HEREIN

BY REFERENCE OR REFERRED TO HEREIN. IF SUCH INFORMATION OR REPRESENTATION IS GIVEN OR MADE, IT MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY CREDITOR OR INTEREST HOLDER DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH ITS OWN ADVISORS.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE INFORMATION REGARDING THE DEBTOR'S HISTORY, BUSINESS, AND OPERATIONS, IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN BUT, AS TO CONTESTED MATTERS AND ADVERSARY PROCEEDINGS THAT MAY BE PENDING AS OF THE FILING OF THE DEBTOR'S CHAPTER 11 CASE OR COMMENCED AFTER THE FILING OF THE DEBTOR'S CHAPTER 11 CASE, IS NOT TO BE CONSTRUED AS AN ADMISSION OR A STIPULATION BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN CONSTITUTES AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR SHALL BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED A REPRESENTATION OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY THEIR NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. ALL HOLDERS OF IMPAIRED CLAIMS SHOULD CAREFULLY READ AND CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY, INCLUDING **SECTION IV — "RISK FACTORS TO BE CONSIDERED,"** BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THE DEBTOR'S CHAPTER 11 CASE AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTOR BELIEVES THAT SUCH SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE FULL TEXT OF SUCH DOCUMENTS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. UNLESS SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTING FIRM. THE DEBTOR DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING FINANCIAL INFORMATION, IS WITHOUT ANY INACCURACY OR OMISSION.

THE DEBTOR BELIEVES THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR'S ESTATE, CREDITORS AND EQUITY INTEREST HOLDERS. ACCORDINGLY, THE DEBTOR URGES HOLDERS OF CLAIMS TO VOTE TO ACCEPT THE PLAN. FOR FURTHER INFORMATION AND INSTRUCTIONS ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE SECTION I OF THIS DISCLOSURE STATEMENT, ENTITLED **"PLAN VOTING INSTRUCTIONS AND PROCEDURES**."

EXCEPT WITH RESPECT TO THE "FINANCIAL PROJECTIONS" INCLUDED HEREIN IN **SECTION VII – "FEASIBILITY, VALUATION, BEST INTERESTS OF CREDITORS AND CONFIRMATION WITHOUT ACCEPTANCE OF ALL IMPAIRED CLASSES"** AND EXCEPT AS OTHERWISE SPECIFICALLY AND EXPRESSLY STATED HEREIN, THIS DISCLOSURE STATEMENT

DOES NOT REFLECT ANY EVENTS THAT MAY OCCUR SUBSEQUENT TO THE DATE HEREOF AND THAT MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. ACCORDINGLY, THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCE, IMPLY THAT THE INFORMATION HEREIN IS CORRECT OR COMPLETE AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS:** This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, among others, those summarized herein. *See* **Section IV — "Risk Factors To Be Considered."** When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements. Although the Debtor believes that its plans, intentions, and expectations reflected in the forward-looking statements are reasonable, it cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtor or persons acting on its behalf are expressly qualified in their entirety by the cautionary statements set forth in this Disclosure Statement. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtor expressly disclaims any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

**TABLE OF CONTENTS**

INTRODUCTION AND DISCLAIMER ...................................................................................................ii
I.    PLAN VOTING INSTRUCTIONS AND PROCEDURES ..................................................... 1
      A.    Notice To Creditors ................................................................................................. 1
      B.    Solicitation Procedures And Solicitation Package .................................................. 1
      C.    Voting Procedures And Voting Deadline ................................................................. 1
      D.    Revocation; Waivers Of Defects; Irregularities ...................................................... 2
      E.    Combined Hearing On Plan Confirmation And Adequacy Of The Disclosure Statement
            And Deadline For Objections ................................................................................... 3
II.   OVERVIEW OF THE DEBTOR ........................................................................................... 3
      A.    Overview Of The Debtor's Business ........................................................................ 3
      B.    Pre-Petition Debt ..................................................................................................... 4
      C.    Events Leading To The Chapter 11 Filing ............................................................... 5
      D.    First Day Motions .................................................................................................... 7
III.  SUMMARY OF THE PLAN OF REORGANIZATION ....................................................... 7
      A.    Overview Of Chapter 11 .......................................................................................... 7
      B.    The Equity Investment ............................................................................................. 8
      C.    Plan Supplement ...................................................................................................... 8
      D.    Classification And Settlement And Treatment Of Claims And Interests ................. 8
            1.    Treatment Of Unclassified Claims ............................................................... 8
            2.    Classification And Treatment Of Claims And Interests .............................. 10
            3.    Acceptance Or Rejection Of The Plan ........................................................ 11
            4.    Means For Implementation Of The Plan ..................................................... 11
      E.    Provisions Governing Distributions ...................................................................... 13
            1.    Allowed Claims ........................................................................................... 13
            2.    Distributions For Claims Allowed As Of The Effective Date ..................... 13
            3.    Interest And Penalties On Claims ............................................................... 13
            4.    Means Of Cash Payment ............................................................................. 13
            5.    Withholding And Reporting Requirements/Allocations .............................. 13
            6.    Preservation Of Rights ............................................................................... 13
      F.    Treatment Of Executory Contracts And Unexpired Leases ................................... 14
            1.    Assumption Of Executory Contracts And Unexpired Leases ...................... 14
            2.    Indemnification ........................................................................................... 14
            3.    Cure Of Defaults Under Assumed Contracts .............................................. 14
      G.    Confirmation And Consummation Of The Plan ..................................................... 15
            1.    Condition To Confirmation ......................................................................... 15
            2.    Conditions To Effective Date ...................................................................... 15
            3.    Waiver Of Conditions ................................................................................. 16
      H.    Effect Of Plan Confirmation ................................................................................. 16
            1.    Binding Effect ............................................................................................. 16
            2.    Revesting Of Assets ..................................................................................... 16
            3.    Compromise And Settlement Of Claims, Interests And Controversies ....... 16
            4.    Releases And Related Matters ..................................................................... 17
            5.    Discharge Of The Debtor ............................................................................ 18
            6.    Injunction ................................................................................................... 18
            7.    Exculpation And Limitation Of Liability .................................................... 18
            8.    Term Of Bankruptcy Injunction Or Stays .................................................. 19
            9.    Post-Confirmation Date Retention Of Professionals ................................. 19
      I.    Procedures For Resolving And Treating Disputed Claims And Interests ............... 19
            1.    Disputed Claims And Interests ................................................................... 19
            2.    Objection Deadline ..................................................................................... 19
            3.    Prosecution Of Objections .......................................................................... 19
            4.    No Distributions Pending Allowance .......................................................... 20
      J.    Retention Of Jurisdiction ....................................................................................... 20
            1.    Retention Of Jurisdiction ............................................................................ 20

|  | K. | Miscellaneous Provisions | 21 |
|  |  | 1. | Payment Of Statutory Fees | 21 |
|  |  | 2. | Amendment Or Modification Of The Plan | 21 |
|  |  | 3. | Severability Of Plan Provisions | 22 |
|  |  | 4. | Successors And Assigns | 22 |
|  |  | 5. | Revocation, Withdrawal, Or Non-Consummation | 22 |
|  |  | 6. | Governing Law | 22 |
| IV. | RISK FACTORS TO BE CONSIDERED | 22 |
|  | A. | Failure To Confirm The Plan | 23 |
|  | B. | Potential Adverse Effects Of Chapter 11 | 23 |
|  | C. | No Assurance Of Ultimate Recoveries; Uncertainty Of Financial Projections | 23 |
|  |  | 1. | No Assurance Of Ultimate Recoveries | 23 |
|  |  | 2. | Inherent Uncertainty Of Debtor's Financial Projections | 23 |
|  | D. | Business And Operational Risks | 24 |
|  |  | 1. | Real Estate Market Conditions | 24 |
|  |  | 2. | Debt Agreements And Instruments Contain Restrictive Covenants | 24 |
|  | E. | Legal and Regulatory Risks | 24 |
|  |  | 1. | Litigation | 24 |
|  | F. | Classification And Treatment Of Claims And Interests | 24 |
| V. | CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN | 25 |
|  | A. | Certain U.S. Federal Income Tax Consequences To U.S. Holders | 26 |
|  |  | 1. | U.S. Holders Of Class 3 Secured Credit Facility Claims | 26 |
|  |  | 2. | U.S. Holders Of Class 4 General Unsecured Claims | 29 |
|  | B. | Certain U.S. Federal Income Tax Consequences To Non-U.S. Holders | 30 |
|  |  | 1. | General | 30 |
|  |  | 2. | Accrued Interest | 30 |
|  | C. | Importance Of Obtaining Professional Tax Assistance | 30 |
| VI. | APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS | 31 |
|  | A. | Issuance And Resale Of Plan Securities Under The Plan Pursuant To Section 4(a)(2) | 31 |
|  |  | 1. | Exemption From Registration | 31 |
|  |  | 2. | Resales Of Preferred Equity Interests | 31 |
| VII. | FEASIBILITY, VALUATION, BEST INTERESTS OF CREDITORS AND CONFIRMATION WITHOUT ACCEPTANCE OF ALL IMPAIRED CLASSES | 32 |
|  | A. | Feasibility Of The Plan | 32 |
|  | B. | Best Interests Test | 33 |
|  | C. | Confirmation Without Acceptance Of All Impaired Classes | 34 |
| VIII. | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 35 |
| IX. | CONCLUSION AND RECOMMENDATION | 35 |

# APPENDICES

APPENDIX A          Plan of Reorganization

APPENDIX B          Corporate Organization Chart

APPENDIX C          Portfolio Valuation

APPENDIX D          Annual Financial Statements

## I.   PLAN VOTING INSTRUCTIONS AND PROCEDURES

### A.   Notice To Creditors

This Disclosure Statement is being transmitted to holders of claims and interests that are entitled under the Bankruptcy Code to vote on the Plan. The purpose of this Disclosure Statement is to provide adequate information to enable such holders to make a reasonably informed decision with respect to the Plan prior to exercising their right to vote to accept or reject the Plan. All other classes are unimpaired under the Plan, in which case the holders of claims in such classes are deemed to have accepted the Plan.

ALL HOLDERS OF IMPAIRED CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN. THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION ABOUT THE PLAN AND IMPORTANT CONSIDERATIONS PERTINENT TO ACCEPTANCE OR REJECTION OF THE PLAN. THIS DISCLOSURE STATEMENT, THE PLAN, AND BALLOTS ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. NO PERSON HAS BEEN AUTHORIZED TO DISTRIBUTE ANY INFORMATION CONCERNING THE DEBTOR RELATING TO THE SOLICITATION OTHER THAN THE INFORMATION CONTAINED HEREIN.

### B.   Solicitation Procedures And Solicitation Package

The Debtor is causing "Solicitation Packages" to be distributed to holders of Claims and Interests. With respect to holders of Claims and Interests entitled to vote on the Plan, each Solicitation Package shall include: (1) a copy of the order approving the Ballot and Tabulation Procedures approved by the Court (the "Voting Procedures Order"), (2) a notice of the combined hearing to consider confirmation of the Plan and the adequacy of this Disclosure Statement (the "Combined Hearing Notice"), (3) this Disclosure Statement with the Plan annexed thereto, and (4) an appropriate form of ballot(s) and appropriate return envelope with postage pre-paid. With respect to holders of Claims and Interests not entitled to vote on the Plan, each Solicitation Package shall include (1) the Combined Hearing Notice, (2) a notice of such holder's non-voting status – unimpaired classes, and (3) such other materials as may be ordered or permitted by the Bankruptcy Court.

The Voting Procedures Order sets forth, among other things (1) solicitation procedures with respect to holders of Claims and Interests in voting classes, (2) the deadline for submitting ballots to accept or reject the Plan, (3) the date, time and place of hearing to consider confirmation of the Plan and adequacy of the Disclosure Statement, (4) the deadline for filing objections to the Plan and/or the adequacy of the Disclosure Statement, (5) the voting record date, and (6) procedures for tabulation of the ballots cast on the Plan, including assumptions and procedures for tabulating ballots that are not completed fully or correctly. Holders of Claims and Interests should read the Voting Procedures Order and, if applicable, the instructions attached to the ballot received in the Solicitation Package in connection with this section of the Disclosure Statement.

### C.   Voting Procedures And Voting Deadline

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot. Please complete and sign your ballot and return your ballot to FrankGecker LLP (the "Voting Agent") either by fax, to the fax number set forth below; email, to the email address set forth below; or by hand delivery during customary business hours, or overnight courier to the address set forth below, so that it is received by the Voting Deadline.

THE VOTING DEADLINE IS 4:00 P.M. PREVAILING CENTRAL TIME ON [●], 2015 UNLESS EXTENDED BY THE DEBTOR (THE "VOTING DEADLINE"). THE VOTING RECORD DATE FOR DETERMINING WHETHER A HOLDER OF A CLAIM OR INTEREST IS ENTITLED TO VOTE ON THE PLAN IS [●], 2015. FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED NO LATER THAN THE VOTING DEADLINE BY THE VOTING AGENT AT THE ADDRESS, FAX NUMBER OR EMAIL ADDRESS SET FORTH BELOW.

**If by First-Class Mail:**

FrankGecker LLP
Attn: Ballot
325 N. LaSalle St., Suite 625
Chicago, Illinois 60654

**If by Hand Delivery or Overnight Mail:**

FrankGecker LLP
Attn: Ballot
325 N. LaSalle St., Suite 625
Chicago, Illinois 60654

**If by Email:**

CRPBallots@fgllp.com

**If by Facsimile:**

**(312) 276-0035**

If you have any questions about the procedure for voting your Claim or Interest, the packet of materials that you have received or the amount of your Claim or Interest, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any appendices or exhibits to such documents, please contact Reed Heiligman:

**By Email: CRPBallots@fgllp.com**
**By Phone: (312) 276-1400**

Except as provided below, unless the ballot is timely and properly submitted before the Voting Deadline or the Bankruptcy Court orders otherwise, the Debtor may, in its sole discretion, reject such ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan ("Confirmation"). In the event that any Claim or Interest is the subject of an objection or contested matter, any vote to accept or reject the Plan cast with respect to such Claim or Interest will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Bankruptcy Court orders otherwise.

**D.    Revocation; Waivers Of Defects; Irregularities**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, revocation, or withdrawal of ballots will be determined by the Debtor in its sole discretion, which determination will be final and binding. Once a party delivers a valid ballot for the acceptance or rejection of the Plan, such party may not withdraw or revoke such acceptance or rejection without the Debtor's written consent or an order of the Bankruptcy Court. The Debtor also reserves the right to reject any and all ballots not in proper form.

The Debtor further reserves the right to waive any defects or irregularities or conditions of delivery as to any particular ballot. The interpretation (including the ballot and the respective instructions therein) by the Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as the Debtor (or the Bankruptcy Court) determines. Neither the Debtor nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

E.      **Combined Hearing On Plan Confirmation And Adequacy Of The Disclosure Statement And Deadline For Objections**

THE BANKRUPTCY COURT HAS SCHEDULED A COMBINED HEARING TO CONSIDER CONFIRMATION OF THE PLAN AND THE ADEQUACY OF THE DISCLOSURE STATEMENT ON [●], 2015. PURSUANT TO THE NOTICE OF COMBINED HEARING PROVIDED TO HOLDERS OF CLAIMS AND INTERESTS OR THEIR REPRESENTATIVES, OBJECTIONS TO CONFIRMATION OF THE PLAN AND/OR ADEQUACY OF THE DISCLOSURE STATEMENT MUST BE FILED WITH THE BANKRUPTCY COURT BY [●], 2015 AT 5:00 P.M. PREVAILING CENTRAL TIME AND ARE GOVERNED BY BANKRUPTCY RULES 3020(B) AND 9014 AND THE LOCAL RULES OF THE BANKRUPTCY COURT. UNLESS AN OBJECTION IS TIMELY SERVED AND FILED, SUCH OBJECTION MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AT THE COMBINED HEARING.

## II.      OVERVIEW OF THE DEBTOR

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan. Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan.

A.      **Overview Of The Debtor's Business**

The Debtor is a Delaware limited partnership that was formed in May of 2006 for the primary purpose of acquiring and managing real property. CRP-2 Holdings GP-AA, LLC (the "General Partner") is the general partner of the Debtor. CRP-2 Holdings 2, LLC (the "Limited Partner") is the limited partner of the Debtor. The General Partner and the Limited Partner are controlled, through a series of intermediate entities, by Colony Realty Partners GP II, LLC. Between May and October of 2006, the Debtor acquired fourteen properties for a total purchase price of $286,732,400, financing approximately 60% of the purchase price with proceeds from the Secured Credit Facility. Following the acquisition, the Debtor made substantial additional equity investments in the fourteen properties, substantially increasing cost basis therein. As described below, the Debtor sold four of those properties in 2012 and 2014, using the proceeds to pay off a portion of the principal outstanding under the Secured Credit Facility and to fund a cash reserve controlled by the lender that was established to fund the cash requirements of the remaining Subject Properties (defined below).

As of the Petition Date, the Debtor owns ten properties (each a "Subject Property" and collectively, the "Portfolio") consisting in the aggregate of six office buildings and twenty-six industrial buildings located in and around Chicago, Washington D.C., Boston, and New Jersey. The following table contains further details regarding the Portfolio as of March 31, 2015:

| Subject Property | # of Buildings | Building Type | Cost Basis | Location |
|---|---|---|---|---|
| Corporate Lakes III | 1 | Office | $28.1 million | Lisle, Illinois |
| Highland Atrium | 1 | Office | $10.1 million | Downers Grove, Illinois |
| 1800 Alexander Bell | 1 | Office | $40.7 million | Reston, Virginia |
| 12902 Federal Systems | 1 | Office | $66.1 million | Fairfax, Virginia |
| 371 Hoes Lane | 1 | Office | $19.9 million | Piscataway, New Jersey |
| Reservoir Corporate Center | 1 | Office | $21.6 million | Southborough, Massachusetts |
| CIW – Carol Stream Portfolio | 2 | Industrial/Flex | $5.0 million | Carol Stream, Illinois |
| CIW – Elgin Portfolio | 8 | Industrial/Flex | $29.9 million | Elgin, Illinois |
| CIW – Naperville Portfolio | 5 | Industrial/Flex | $21.9 million | Naperville, Illinois |
| Chicago Infill Portfolio | 11 | Industrial/Flex | $33.0 million | Chicago Area, Illinois |

The Debtor's cost basis in the Portfolio as of March 31, 2015 is $276,182,500. As indicated in the Portfolio Valuation attached hereto as Appendix C, the Subject Properties were most recently appraised by independent, third-party appraisers in the second and third quarters of 2014 at approximately $170,000,000, which included $9,389,000 of cash in an escrow (the "Working Capital Escrow") required under the terms of the Secured Credit Facility (defined below). The Debtor estimates that as of June 30, 2015, the Working Capital Escrow account held a total of $10,893,700 in cash.

**B.      Pre-Petition Debt**

In August 2006, in connection with purchasing the Portfolio, the Debtor obtained financing from JPMorgan Chase Bank, N.A. (the "Original Lender") in the original principal amount of $171,360,000 (the "Secured Credit Facility"). To evidence the Secured Credit Facility, the Debtor and the Original Lender entered into that certain Amended and Restated Loan Agreement dated as of November 30, 2006 (as amended or modified from time to time, the "Existing Credit Agreement" and together with any other related documents pertaining to the Secured Credit Facility, the "Secured Credit Facility Documents"). The Secured Credit Facility was divided into three tranches (each a "Sub Note") with staggered maturities in 2011, 2013, and 2014, respectively.

As security for payment and performance of the Debtor's obligations in connection with the Secured Credit Facility (the "Secured Obligations"), the Debtor granted to the Original Lender security interests in the Portfolio. Each Sub Note was secured by a separate collateral pool comprised of specified Subject Properties. Pursuant to the Secured Credit Facility Documents, full payoff of a Sub Note releases the associated Subject Properties from the collateral pool. The 2011 Sub Note was secured by: (i) 12902 Federal Systems, (ii) Corporate Lakes III, (iii) 371 Hoes Lane, and (iv) an industrial property in Houston that has since been sold. The 2013 Sub Note was secured by (i) CIW – Elgin Portfolio, (ii) Reservoir Corporate Center, (iii) CIW – Naperville Portfolio, (iv) Highland Atrium, and (v) CIW – Carol Stream Portfolio. The 2014 Sub Note was secured by (i) 1800 Alexander Bell, (ii) Chicago Infill Portfolio, and (iii) additional properties in Texas and Georgia that have since been sold.

To further secure payment and performance of the Secured Obligations, the Debtor executed, acknowledged and delivered to the Original Lender certain assignments entitled Amended and Restated Assignment of Leases and Rents dated November 30, 2006. In addition, with respect to each Subject Property, the Debtor entered into certain lockbox and cash management agreements (collectively, the "Lockbox Agreements"). Pursuant to the Existing Credit Agreement and the Lockbox Agreements, the Debtor (i) agreed to deposit or cause to be deposited rents and other income received by or on behalf of the Debtor into applicable lockbox accounts and (ii) granted the Original Lender a first priority security interest in such lockbox accounts.

Through a series of assignments of the Secured Credit Facility, U.S. Bank National Association ("U.S. Bank" or the "Lender") became, and remains, the owner and holder of all right, title and interest in and to the Secured Credit Facility.

The Debtor and U.S. Bank entered into the Modification Agreement (described below) in 2012. Pursuant to the Modification Agreement, the Debtor invested an additional $8,500,000 into the Portfolio to pay expenses of the Modification Agreement and seed the Working Capital Escrow (to be used for leasing costs and building improvements), and the parties agreed to extend the initial maturity date of each Sub Note to December 1, 2014. Under the Modification Agreement, the Debtor has the option to further extend the maturity date of each Sub Note to December 1, 2015 and, subsequently, to December 1, 2016 upon the conditions described therein. The Debtor has not exercised these options. In addition, pursuant to the Modification Agreement, each Sub-Note was collateralized by the entire Portfolio so that, in effect, there is now a single loan secured by the entire Portfolio.

As of July 1, 2015, the outstanding balance of the Secured Obligations is equal to approximately $163,000,000, which includes all unpaid principal, deferred interest, charges and fees as asserted by the Lender through April 1, 2015 and additional current and default interest that accrued on the loan from April 1, 2015 through June 30, 2015. The Debtor has no other secured debt outstanding as of the Petition Date. As of July 14, 2015, the Debtor has approximately $1,300,000 in unpaid taxes and $1,400,000 in other unsecured debt, comprised of trade credit incurred in the ordinary course of the Debtor's business. As noted above, the Subject Properties were appraised by independent, third-party appraisers in the second and third quarters of 2014 at a value equal to approximately $170,000,000, which included a $9,389,000 cash balance in the Working Capital Escrow. The Debtor estimates the fair value of the Portfolio to be at least equal to this amount. This amount exceeds all of the Debtor's debt by several million dollars. Accordingly, the Debtor believes there is substantial equity in the Portfolio. Moreover, with the commitment of $10,000,000 in new equity described in the Plan, the Debtor believes the value of the Reorganized Debtor will be approximately $180,000,000 at a minimum.

## C.    Events Leading To The Chapter 11 Filing

The global recession and attendant downturn in the United States real estate market from 2007 through 2009 has strained the Debtor's balance sheet and ability to service its debt. During this period, rental rates decreased nationwide, financing for real estate transactions dried up, and capitalization rates increased. Since 2009, the recovery in real estate has been uneven, with strong recoveries in various coastal cities, but slower recoveries for areas in which the Subject Properties are located. In particular, as a result of lagging job growth, the Chicago real estate market has been slow to rebound. In addition, although government stimulus programs enabled the Washington D.C. metro area to initially recover quickly, subsequent political uncertainty around the 2012 presidential election, government gridlock, and the 2013 government sequester had deleterious effects on that market.

As a result of these and other factors, vacancy rates for the Debtor's portfolio have increased in recent years, contributing to a decline in the Debtor's earnings and liquidity position. Notably, in January 2010, IBM exited 12902 Federal Systems as part of a corporate level consolidation. Due to the state of the market in the surrounding D.C. metro area, the Debtor temporarily delayed a significant repositioning effort with respect to this property. As projections for this market have improved since 2014, the Debtor has invested significant capital in the asset. However, 12902 Federal Systems, the largest single asset in the portfolio, remains entirely vacant. Similarly, other assets have struggled in the wake of the global recession as tenants have vacated or downsized and have not yet been fully replaced. For example, at the end of 2013, a major tenant at Highland Atrium filed for bankruptcy and vacated the premises. As a result of these and other developments, the Debtor's portfolio was 68% occupied as of June 30, 2015, as compared to an average 88% occupancy at the time of acquisition. The table below shows the square footage of each property and its occupancy.

| Subject Property | Type | Square Feet | Occupancy | Location |
|---|---|---|---|---|
| Corporate Lakes III | Office | 124,327 | 64% | Lisle, Illinois |
| Highland Atrium | Office | 68,251 | 71% | Downers Grove, Illinois |
| 1800 Alexander Bell | Office | 138,475 | 76% | Reston, Virginia |
| 12902 Federal Systems | Office | 210,993 | 0% | Fairfax, Virginia |
| 371 Hoes Lane | Office | 139,454 | 88% | Piscataway, New Jersey |
| Reservoir Corporate Center | Office | 99,853 | 100% | Southborough, Massachusetts |
| CIW – Carol Stream Portfolio | Industrial/Flex | 64,285 | 22% | Carol Stream, Illinois |
| CIW – Elgin Portfolio | Industrial/Flex | 245,882 | 61% | Elgin, Illinois |
| CIW – Naperville Portfolio | Industrial/Flex | 162,065 | 68% | Naperville, Illinois |
| Chicago Infill Portfolio | Industrial/Flex | 513,264 | 92% | Chicago Area, Illinois |

In the summer of 2011, due to the Debtor's strained liquidity position and the pending maturity of the 2011 Sub Note—which was collateralized by the fully vacant 12902 Federal Systems—the Debtor initiated negotiations to restructure the Secured Credit Facility. Ultimately, after protracted negotiations, the Debtor and U.S. Bank entered into a loan modification agreement (the "Modification Agreement"), effective as of August 1, 2012. The Modification Agreement extended the initial maturity date of the entire Secured Credit Facility to December 1, 2014; provided the Debtor with an option to further extend it upon certain terms and conditions; and provided for each Sub Note to be collateralized by the entire Portfolio. In connection with the restructuring, the Debtor immediately invested an additional $8.5 million in new equity into the Portfolio and agreed to sell Subject Properties and use the proceeds from such sales to make required principal payments of the Secured Credit Facility and use excess proceeds to further fund the Working Capital Escrow for future leasing costs and building improvements.

Subsequent to this debt restructuring, the performance of the Portfolio continued to lag as Virginia and Chicago remained troubled markets, among other factors. In 2012 and 2014, the Debtor sold Subject Properties in Texas and Georgia, using sale proceeds of $36.2 million to repay $27.2 million of principal and to fund $9.0 million into the Working Capital Escrow as required under the modified terms of the Secured Credit Facility. Further, the Debtor invested $1.7 million into the Portfolio during 2014 to cover monthly interest payments coming due prior to maturity.

On September 19, 2014, the Debtor delivered a request (the "Transfer Request") to Midland Loan Servicing, Inc., master servicer of the loan, to transfer the servicing of the loan to special servicer. The Transfer Request included notice that the Debtor would be unable to refinance the loan or meet the required terms of the first extension per the Modification Agreement, and the loan was therefore facing imminent default. In October 2014, the loan was transferred to CWCapital Asset Management LLC ("CWCAM"), special servicer on behalf of U.S. Bank. As contemplated by the Transfer Request, the Debtor did not exercise the extension option, and defaulted on the December 1, 2014 maturity payment.

On December 9, 2014 and December 15, 2014, U.S. Bank sent default notices to the Debtor demanding immediate payment in full of the entire outstanding balance of the Secured Credit Facility. In addition, on December 15, 2014, Midland Loan Services, as servicer under the Modification Agreement, notified the Debtor that it would cause the transfer of all monies in the lockbox accounts into U.S. Bank's cash management accounts. U.S. Bank sent an additional default notice to the Debtor on April 1, 2015 and, the next day, filed a complaint (the "Complaint") in the United States District Court for the Southern District of New York seeking to appoint a receiver to manage the Portfolio. On June 3, 2015, the Debtor filed a motion to dismiss the Complaint for lack of subject matter jurisdiction. On June 23, 2015, U.S. Bank voluntarily dismissed the matter.

On April 23, 2015, the Debtor executed a Pre-Negotiation Agreement (the "PNA") under which the Debtor and CWCAM would agree to commence discussions regarding a potential loan modification or work-out. The PNA came after many months of discussions between representatives of the Debtor and representatives of CWCAM. These discussions continued after execution of the PNA, during which the parties met at CWCAM's office and subsequently exchanged several proposals for a consensual restructuring of the Secured Credit Facility that included, among other things, a significant cash infusion by the Debtor's owners. Ultimately, these negotiations

proved unsuccessful. Accordingly, the Debtor determined that this chapter 11 filing was a necessary step to preserve the going concern value of its business and maximize the value of the Portfolio, including the value of its equity. As noted above, based on the most recent appraisal of the Subject Properties, the Debtor believes that the fair value of the Portfolio exceeds the outstanding amount of the Secured Credit Facility and all other outstanding debts of the Debtor. However, due to the Portfolio's current vacancy rates and pending lease expirations at a number of the Subject Properties, the Debtor believes that sales of these Subject Properties at this time would yield depressed prices that would not pay all debt in full. Accordingly, the Debtor, through this chapter 11 filing, seeks to extend the maturity of the Secured Credit Facility, continue to manage the Portfolio as a going-concern and maximize value for all constituents.

**D.    First Day Motions**

To ease its transition into chapter 11 and to expedite its emergence from chapter 11, on the Petition Date, the Debtor has filed various "first day" motions. In particular, the Debtor filed motions requesting that this Court (i) extend the deadline to file schedules and statements, (ii) determine procedures for adequate assurance of payment for utility providers, (iii) authorize the Debtor to continue using its existing cash management system, (iv) authorize the Debtor to continue using its cash collateral, (v) establish bar dates for the filing of claims in this case, and (vi) approve solicitation and voting procedures.

## III.    SUMMARY OF THE PLAN OF REORGANIZATION

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or the documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statements of such terms and provisions. The Plan itself and the documents referred to therein control the actual treatment of Claims against and Interests in the Debtor under the Plan and will, upon the Effective Date, be binding upon all holders of Claims against and Interests in the Debtor and its estate, the Reorganized Debtor, and other parties in interest. In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan or any other operative document, on the other hand, the terms of the Plan and such other operative document are controlling.

**A.    Overview Of Chapter 11**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors, and its interest holders. Another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets. The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization or liquidation is the principal objective of a chapter 11 case. The plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the Bankruptcy Court makes that plan binding upon the debtor and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) holds a claim or interest that is impaired under the plan; (ii) has voted to accept or reject the plan; or (iii) receives or retains any property under the plan.

### B.    The Equity Investment

In connection with the Plan, Colony Realty Partners II REIT ("REIT") will contribute to the Debtor a new cash investment of $10 million and, thereafter, up to an additional $30 million, in its sole and absolute discretion, subject to the terms and conditions set forth in the Equity Investment Term Sheet, a copy of which is attached to the Plan as Exhibit B (the "Equity Investment"). Preferred equity in the Reorganized Debtor will be distributed to REIT (the "Preferred Equity Interests") on account of the Equity Investment. The Preferred Equity Interests will be accorded priority in right of payment over the GP Interests and the LP Interests. The Preferred Equity Interests will be issued pursuant to an exemption under section 4(a)(2) of the Securities Act, and may not be transferred or resold absent registration or exemption under the Securities Act or any applicable state securities laws.

### C.    Plan Supplement

The Debtor will file the Plan Supplement on or prior to [●], 2015, or such later date with respect to individual documents as the parties affected by such documents agree. The Plan Supplement consists of the compilation of documents and forms of documents, schedules and exhibits to the Plan, which will include, among other things, the Amended and Restated Secured Credit Facility and the Amended and Restated Limited Partnership Agreement. The Plan Supplement may be altered, amended, modified or supplemented from time to time in accordance with the terms of the Plan and in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### D.    Classification And Settlement And Treatment Of Claims And Interests

The Plan classifies Claims and Interests separately and provides different treatment for different Classes of Claims and Interests in accordance with the Bankruptcy Code. As described more fully below, the Plan provides, separately for each Class, that holders of Claims and Interests will receive types of consideration based on the different rights of the holders of Claims or Interests in each Class. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

In accordance with section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies related to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its estate, and holders of Claims and Interests and is fair, equitable, and reasonable.

1.    *Treatment Of Unclassified Claims*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on the Plan.

(a)    Administrative Claims. On, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, or (c) the date on which an Allowed Administrative Claim becomes payable under any agreement relating thereto,

each Holder of such Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim. Notwithstanding the foregoing, (w) any Professional Fee Claim shall not be paid except in accordance with an order of the Bankruptcy Court permitting such payment and in accordance with applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, (x) any Allowed Administrative Claim based on a liability incurred by the Debtor in the ordinary course of business during the Chapter 11 Case may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto, and (y) any Allowed Administrative Claim may be paid on such other terms as may be agreed to between the Holder of such Allowed Administrative Claim and the Debtor or the Reorganized Debtor.

(b)    Priority Tax Claims.    The legal and equitable rights of the Holders of Priority Tax Claims are Unimpaired by the Plan. Unless the Holder of an Allowed Priority Tax Claim and the Debtor agree to a different treatment, on the Effective Date, each Holder of an Allowed Priority Tax Claim shall have such Claim Reinstated.

(c)    Professional Fee Claims.

(i)    Professionals shall submit final fee applications seeking approval of all Professional Fee Claims no later than thirty (30) days after the Effective Date. These applications remain subject to Bankruptcy Court approval under the standards established by the Bankruptcy Code, including the requirements of sections 327, 328, 330, 331, 363, 503(b) and 1103 of the Bankruptcy Code, as applicable. Payments to Professionals shall be made upon entry of an order approving such Professional Fee Claims.

(ii)    On the Effective Date, the Debtor will establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account will be maintained in trust for the Professionals. The funds in such account will not be property of the Reorganized Debtor except that the Reorganized Debtor shall retain a residual interest to the extent the funds are not used for Allowed Professional Fee Claims. The amount of Professional Fee Claims owing to the Professionals will be paid in Cash to such Professionals by the Reorganized Debtor, or at the Reorganized Debtor's direction, from the Professional Fee Escrow Account, without interest or other earnings therefrom, when such Claims are Allowed by Final Order; provided, however, that the Reorganized Debtor's liability for Professional Fee Claims shall not be limited nor be deemed to be limited to the funds available from the Professional Fee Escrow Account. After all Professional Fee Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, will be transferred to the Reorganized Debtor and serve as collateral for the obligations evidenced by the Amended and Restated Secured Credit Facility.

(iii)    Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and deliver such estimate to the Debtor at least five (5) days prior to the anticipated Effective Date. If a Professional does not provide such estimate, the Debtor may estimate the unbilled fees and expenses of such Professional. The total amount so estimated will constitute the Professional Fee Reserve Amount; provided that such estimate will not be considered an admission or limitation with respect to the fees and expenses of such Professional by any party. The Professional Fee Reserve Amount and the estimated Accrued Professional Compensation amounts submitted by the Professionals will be subject to review by the Debtor, and any objections to the Professional Fee Reserve Amount must be served on the Debtor prior to the Effective Date.

2.      *Classification And Treatment Of Claims And Interests*

(a)      Summary Of Classes

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 .................. | Other Priority Claims | Unimpaired | No (deemed to accept) |
| Class 2 .................. | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 3 .................. | Secured Credit Facility Claims | Impaired | Yes |
| Class 4 .................. | General Unsecured Claims | Impaired | Yes |
| Class 5 .................. | GP Interests in the Debtor | Impaired | Yes |
| Class 6 .................. | LP Interests in the Debtor | Impaired | Yes |

(b)      Treatment Of Classes

(i)      Class 1 – Other Priority Claims.  Class 1 consists of all Other Priority Claims that may exist against the Debtor.  On, or as soon as reasonably practicable after, (a) the Effective Date if such Other Priority Claim is an Allowed Other Priority Claim on the Effective Date or (b) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, each Holder of an Allowed Class 1 Other Priority Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Priority Claim, Cash equal to the unpaid portion of such Allowed Other Priority Claim.

(ii)      Class 2 – Other Secured Claims.  Class 2 consists of all Other Secured Claims that may exist against the Debtor.  On, or as soon as reasonably practicable after, the Effective Date, each Holder of an Allowed Class 2 Other Secured Claim shall have such claim Reinstated.

(iii)      Class 3 – Secured Credit Facility Claims.   Class 3 consists of all Secured Credit Facility Claims.   The Secured Credit Facility Claims shall be Allowed for all purposes in the aggregate amount of $163,723,800.  On, or as soon as reasonably practicable after, the Effective Date, each Holder of an Allowed Class 3 Secured Credit Facility Claim shall receive its pro rata share of the Tranche A Note and the Tranche B Note under the Amended and Restated Secured Credit Facility, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, all Claims arising under the Existing Credit Agreement.

(iv)      Class 4 – General Unsecured Claims.  Class 4 consists of all General Unsecured Claims that exist against the Debtor.  Each Holder of an Allowed Class 4 General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, Cash in the amount of such Allowed General Unsecured Claim, excluding interest accrued after the Petition Date, on the later of (a) the ninetieth day after the Effective Date or (b) the first Business Day after the ninetieth day after the Effective Date on which such Claim is Allowed.

(v)      Class 5 – GP Interests In The Debtor.  Class 5 consists of all GP Interests in the Debtor.  On the Effective Date, all Class 5 GP Interests in the Debtor shall be reinstated, subject to the Equity Investment, the Preferred Equity Interests, and the terms of the Amended and Restated Limited Partnership Agreement.

(vi)      Class 6 – LP Interests In The Debtor.  Class 6 consists of all LP Interests in the Debtor.  On the Effective Date, all Class 6 LP Interests in the Debtor shall be reinstated, subject to the Equity Investment, the Preferred Equity Interests, and the terms of the Amended and Restated Limited Partnership Agreement.

(c)     Alternative Treatment.  Notwithstanding any provision in the Plan to the contrary, any Holder of an Allowed Claim may receive, instead of the distribution or treatment to which it is entitled hereunder, any other distribution or treatment to which it and the Debtor or the Reorganized Debtor may agree in writing; *provided, however,* that under no circumstance may the Debtor or Reorganized Debtor agree to provide any other distribution or treatment to any Holder of an Allowed Claim that would adversely impair the distribution or treatment provided to any other Holder of an Allowed Claim.

(e)     Special Provision Regarding Unimpaired Claims.  Except as otherwise provided in the Plan, nothing shall affect the Debtor's or the Reorganized Debtor's rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including but not limited to all rights with respect to legal and equitable defenses to setoffs against or recoupments of Unimpaired Claims.

3.     *Acceptance Or Rejection Of The Plan*

(a)     Acceptance By Classes Entitled To Vote.  Classes 3, 4, 5 and 6 are entitled to vote to accept or reject the Plan.  Classes 3, 4, 5 and 6 shall have accepted the Plan if (a) the Holders of at least two-thirds in amount of the Allowed Claims or Interests actually voting in each Class have voted to accept the Plan and (b) the Holders of more than one-half in number of the Allowed Claims or Interests actually voting in each Class have voted to accept the Plan, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code.  If there are no votes cast in a particular Class that is entitled to vote on the Plan, then the Plan shall be deemed accepted by such Class.

(b)     Presumed Acceptance Or Rejection Of The Plan.   Classes 1 and 2 are Unimpaired.  Therefore, such Classes are deemed to have accepted the Plan by operation of law and are not entitled to vote to accept or reject the Plan.

(c)     Elimination Of Classes.   To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed to have been deleted from the Plan for purposes of (a) voting to accept or reject the Plan and (b) determining whether it has accepted or rejected the Plan under section 1129(a)(8) of the Bankruptcy Code.

(d)     Cramdown.   The Debtor requests Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtor reserves the right to modify the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

4.     *Means For Implementation Of The Plan*

(a)     Continued Legal Existence.  Except as otherwise provided in the Plan, the Debtor will continue to exist after the Effective Date as a separate legal entity, with all the powers of such entity under applicable law in the jurisdiction in which the Debtor is formed and pursuant to the Debtor's certificate of limited partnership and Amended and Restated Limited Partnership Agreement in effect as of the Effective Date, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.

(b)     Sources Of Cash For Distribution.  All Cash necessary for the Reorganized Debtor to make payments required by the Plan shall be obtained from (a) existing Cash balances, including balances in the Debtor's accounts, (b) the operations of the Debtor or Reorganized Debtor, and (c) the Equity Investment.

(c)     Equity Investment.   On the Effective Date, REIT will contribute to the Reorganized Debtor $10 million and, thereafter, up to an additional $30 million in Cash, in its sole and absolute discretion, subject to the terms and conditions set forth in the Equity Investment Term Sheet.  In exchange for the foregoing, REIT shall receive 100% of the shares of Preferred Equity Interests in the Reorganized Debtor.  The Preferred Equity Interests will be issued pursuant to an exemption under section 4(a)(2) of the Securities Act, and may not be transferred or resold absent registration or exemption under the Securities Act or any applicable state securities law.

(d)     Corporate Action.  Each of the matters provided for under the Plan involving the corporate structure of the Debtor or Reorganized Debtor or any corporate action to be taken by or required of the Debtor or Reorganized Debtor shall be deemed to have occurred and be effective as provided in the Plan, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by partners, creditors, directors or managers of the Debtor or the Reorganized Debtor.

(e)     Preservation Of Retained Actions.  In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtor will retain and may (but is not required to) enforce all Retained Actions.  After the Effective Date, the Reorganized Debtor, in its sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), without further approval of the Bankruptcy Court.  The Reorganized Debtor or any successor, in the exercise of its sole discretion, may pursue such Retained Actions so long as it is in the best interests of the Reorganized Debtor or any successor holding such rights of action.  The failure of the Debtor to specifically list any claim, right of action, suit, proceeding or other Retained Action in the Plan or the Disclosure Statement does not, and will not be deemed to, constitute a waiver or release by the Debtor or the Reorganized Debtor of such claim, right of action, suit, proceeding or other Retained Action, and the Reorganized Debtor will retain the right to pursue such claims, rights of action, suits, proceedings and other Retained Actions in its sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches will apply to such claim, right of action, suit, proceeding, or other Retained Action upon or after the Confirmation or consummation of the Plan.

(f)     Effectuating Documents; Further Transactions.   The Debtor and Reorganized Debtor, and their respective designees, are authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, or to otherwise comply with applicable law.

(g)     Exemption From Certain Transfer Taxes And Recording Fees.   Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from the Debtor to the Reorganized Debtor or to any other Person or entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtor's real or personal property will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

(h)     Further Authorization.  The Debtor and the Reorganized Debtor shall be entitled to seek such orders, judgments, injunctions, and rulings as they deem necessary to carry out the intentions and purposes, and to give full effect to the provisions, of the Plan.

E.   **Provisions Governing Distributions**

1.   *Allowed Claims*

Notwithstanding any provision in the Plan to the contrary, the Debtor or the Reorganized Debtor shall make distributions only to Holders of Allowed Claims.  A Holder of a Disputed Claim shall receive a distribution on account thereof only when and to the extent that such Holder's Disputed Claim becomes an Allowed Claim.

2.   *Distributions For Claims Allowed As Of The Effective Date*

Except as otherwise provided under the Plan or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable.  Any distribution to be made on the Effective Date pursuant to the Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

3.   *Interest And Penalties On Claims*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest and penalties shall not accrue or be paid on any Claim, and no Holder of a Claim shall be entitled to interest and penalties accruing on or after the Petition Date through the date such Claim is satisfied in accordance with the terms of the Plan.

4.   *Means Of Cash Payment*

Payments of Cash made pursuant to the Plan shall be made, at the option and in the sole discretion of the Reorganized Debtor, (a) by checks drawn on or wire transfer from a domestic bank selected by the Reorganized Debtor, (b) in accordance with the terms of the Amended and Restated Secured Credit Facility, or (c) by such means as are necessary or customary in a particular foreign jurisdiction.

5.   *Withholding And Reporting Requirements/Allocations*

In connection with the Plan and all distributions thereunder, the Reorganized Debtor shall comply with all withholding and reporting requirements imposed by any taxing authority, and all distributions under the Plan shall be subject to any such withholding and reporting requirements.  The Reorganized Debtor shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

6.   *Preservation Of Rights*

Except as otherwise provided in the Plan, the Reorganized Debtor shall retain all rights arising under section 558 of the Bankruptcy Code or applicable nonbankruptcy laws, including, but not limited to, the right to set off against any Claim, the payments or other distributions to be made pursuant to the Plan in respect of such

Claim, or claims of any nature whatsoever that the Debtor or the Reorganized Debtor may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Reorganized Debtor of any such claim that the Debtor or the Reorganized Debtor may have against such Holder; provided, further, that the Holder of any Claim must assert any right to setoff prior to the Effective Date or such right shall be deemed waived on the Effective Date. Notwithstanding any other provision of the Plan, the United States' rights to setoff and recoupment are preserved.

**F.      Treatment Of Executory Contracts And Unexpired Leases**

  1.  *Assumption Of Executory Contracts And Unexpired Leases*

     (a)  Except as otherwise provided in the Plan, on the Effective Date, all Executory Contracts and Unexpired Leases of the Debtor shall be deemed assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease (a) has previously been rejected by order of the Bankruptcy Court in effect as of the Effective Date (which order may be the Confirmation Order); (b) is the subject of a motion to reject filed on or before the Effective Date; (c) is identified as an Executory Contract or Unexpired Lease to be rejected pursuant to the Plan Supplement before the Effective Date; or (d) expired or terminated pursuant to its own terms. An Executory Contract or Unexpired Lease that is deemed to be assumed pursuant to the foregoing sentence shall be referred to as an "Assumed Contract."

     (b)  Entry of the Confirmation Order by the Bankruptcy Court shall constitute findings by the Bankruptcy Court that (a) the Reorganized Debtor has properly provided for the cure of any defaults that might have existed, (b) each assumption is in the best interest of the Reorganized Debtor, its Estate, and all parties in interest in the Chapter 11 Case and (c) the requirements for assumption of any Executory Contract or Unexpired Lease to be assumed have been satisfied. Except as otherwise provided in the following sentence, all cure payments under any Assumed Contract shall be made by the Reorganized Debtor on the Effective Date or as soon as practicable thereafter. In the event of a dispute, cure payments required by section 365(b)(1) of the Bankruptcy Code shall be paid upon entry of a Final Order resolving such dispute.

  2.  *Indemnification*

     Except as otherwise specifically limited in the Plan, any obligations or rights of the Debtor or Reorganized Debtor to defend, indemnify, reimburse, or limit the liability of the Debtor's present and former members, officers, employees, agents, representatives, attorneys, accountants, financial advisors, restructuring advisors, investment bankers and consultants (the "Covered Persons") pursuant to the Debtor's or Reorganized Debtor's certificates of limited partnership, by-laws, policy of providing employee indemnification, applicable law, or specific agreement in respect of any claims, demands, suits, Causes of Action, or proceedings against such Covered Persons based upon any act or omission related to such Covered Persons' service with, for, or on behalf of the Debtor prior to the Effective Date, shall be treated as if they were Executory Contracts that are assumed under the Plan and shall survive the Effective Date and remain unaffected thereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement, or limitation of liability is owed in connection with an occurrence before or after the Petition Date.

  3.  *Cure Of Defaults Under Assumed Contracts*

     The Reorganized Debtor shall cure any monetary defaults under any Executory Contract and Unexpired Lease to be assumed pursuant to the Plan by paying to the non-Debtor counterparty the full amount of any monetary default in the ordinary course of business. Accordingly, no party to an Assumed Contract need file any cure claim, and the Debtor need not file any lists of any proposed cure claims, with the Bankruptcy Court. Notwithstanding the foregoing, the Reorganized Debtor and counter-parties to Assumed Contracts reserve all their

rights in the event of a dispute over the amount of a cure claim. If there is any such dispute that cannot be resolved consensually, then either party must file with the Bankruptcy Court a request for allowance and payment of such cure claim within seventy-five (75) days from the Effective Date. Moreover, the Reorganized Debtor shall be authorized to reject any Executory Contract or Unexpired Lease to the extent the Reorganized Debtor, in the exercise of its sound business judgment, concludes that the amount of the cure claim as determined by the Bankruptcy Court, renders assumption of such Executory Contract or Unexpired Lease unfavorable to the Reorganized Debtor.

## G.    Confirmation And Consummation Of The Plan

### 1.    *Condition To Confirmation*

Confirmation of the Plan is conditioned upon the Confirmation Order being reasonably acceptable in form and substance to the Debtor.

### 2.    *Conditions To Effective Date*

The Debtor shall request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry. The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Debtor in accordance with the terms hereof:

(a)    The Confirmation Order, in form and substance reasonably satisfactory to the Debtor, shall have become a Final Order and shall, among other things, provide that the Debtor and the Reorganized Debtor are authorized to take all actions necessary or appropriate to enter into, implement, and consummate the agreements and documents created in connection with the Plan.

(b)    All documents related to, provided for in, or contemplated by the Amended and Restated Secured Credit Facility and the Amended and Restated Limited Partnership Agreement shall have been executed and delivered, and all conditions precedent thereto shall have been satisfied (other than the occurrence of the Effective Date), which shall occur simultaneously with the satisfaction of all conditions precedent under the Amended and Restated Secured Credit Facility and the Amended and Restated Limited Partnership Agreement, as applicable.

(c)    The Amended and Restated Secured Credit Facility Documents shall be executed, fully enforceable and binding upon all parties thereto and all conditions precedent thereto shall be satisfied or waived in writing in accordance with the terms thereof.

(d)    The Debtor shall have received the Equity Investment and such funds shall be available for contribution.

(e)    The Professional Fee Escrow Account shall have been funded.

(f)    All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained.

(g)      All other actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

### 3.      *Waiver Of Conditions*

Except as expressly provided in the Plan, each of the conditions to the Effective Date set forth in the Plan may be waived in whole or in part by the Debtor, without any notice to parties in interest or the Bankruptcy Court and without a hearing.  The failure to satisfy or waive any condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied, including any action or inaction by the Debtor.  The failure of the Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

## H.      **Effect Of Plan Confirmation**

### 1.      *Binding Effect*

The Plan shall be binding upon and inure to the benefit of the Debtor, its Estate, all present and former Holders of Claims and Interests, and their respective successors and assigns, including but not limited to the Reorganized Debtor.

### 2.      *Revesting Of Assets*

Except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising the Estate (including Retained Actions, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall revest in the Reorganized Debtor, free and clear of all Claims, Liens, charges, encumbrances, rights and Interests of creditors and equity security holders.  As of the Effective Date, the Reorganized Debtor may operate its businesses and use, acquire, and dispose of its property without supervision of the Bankruptcy Court, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

### 3.      *Compromise And Settlement Of Claims, Interests And Controversies*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies related to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate and Holders of Claims and Interests and is fair, equitable and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims against or Interests in it and Causes of Action against other Persons.

4.      *Releases And Related Matters*

(a)      **Releases By The Debtor**

Pursuant to section 1123(b) of the Bankruptcy Code and to the extent allowed by applicable law, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtor and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtor, the Reorganized Debtor and the Estate from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtor, the Reorganized Debtor or the Estate have asserted or would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's restructuring, the Chapter 11 Case, the purchase, sale or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the Plan Supplement, the business or contractual arrangements between any Debtor, Reorganized Debtor, Estate or non-Debtor Affiliate and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments or other documents, or any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided, however* that nothing in Section 9.4(a) of the Plan shall be construed to release any party or entity from gross negligence, intentional fraud, willful misconduct, or criminal conduct, as determined by a Final Order of a court of competent jurisdiction.

(b)      **Third-Party Releases By Holders Of Claims Or Equity Interests**

Except as otherwise provided in the Plan or the Plan Supplement, as of the Effective Date, each Holder of a Claim against or Interest in the Debtor, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Debtor, the Reorganized Debtor, the Estate, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims assertable on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's restructuring, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan or the Plan Supplement, the business or contractual arrangements between the Debtor, Reorganized Debtor, Estate or non-Debtor Affiliate and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event or other occurrence including or pertaining to the Debtor and taking place on or before the Effective Date, *provided, however* that nothing in Section 9.4(b) of the Plan shall be construed to release any party or entity from gross negligence, intentional fraud, willful misconduct, or criminal conduct, as determined by a Final Order of a court of competent jurisdiction; *provided further, however*, that Section 9.4(b) of the Plan shall not release the Debtor, the Reorganized Debtor, the Estate or the Released Parties from any Cause of Action held by a governmental entity existing as of the Effective Date based on (i) the Internal Revenue Code or other domestic state, city, or municipal tax code, (ii) the environmental laws of the United States or any domestic state, city, or municipality, (iii) any criminal laws of the United States or any domestic state, city, or municipality, (iv) the Securities Exchange Act of 1934 (as now in effect or hereafter amended), the Securities

Act, or other securities laws of the United States or any domestic state, city or municipality, (v) the Employee Retirement Income Security Act of 1974, as amended, or (vi) the laws and regulations of the Bureau of Customs and Border Protection of the United States Department of Homeland Security.  Notwithstanding anything to the contrary in Section 9.4(b) of the Plan, a Holder of a Claim shall be deemed not to provide the releases set forth in this section if such Holder (i) votes to reject the Plan and (ii) "opts out" of the releases provided in Section 9.4(b) of the Plan in a timely submitted, valid Ballot, *provided, however*, that nothing in this sentence shall limit the discharge contained in Section 9.5 of the Plan.  For the avoidance of doubt, nothing in Section 9.4(b) of the Plan shall release any Claims relating to actions or conduct occurring after the Effective Date and arising under or relating to the Amended and Restated Secured Credit Facility or the Amended and Restated Limited Partnership Agreement.

5. *Discharge Of The Debtor*

(a)    Upon the Effective Date, the Debtor shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (i) a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (iii) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (iv) the Holder of a Claim based upon such debt accepted the Plan.

(b)    As of the Effective Date, except as provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtor or the Reorganized Debtor, any other or further Claims, debts, rights, Causes of Action, claims for relief, liabilities, or equity interests relating to the Debtor based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtor, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim.

6. *Injunction*

Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, or liability that is released or discharged under Article IX of the Plan are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor, the Released Parties and their respective Affiliates or their property on account of any such released or discharged Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, or liability: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any Lien or encumbrance; (d) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to any released Person; or (e) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.

7. *Exculpation And Limitation Of Liability*

None of the Released Parties shall have or incur any liability to any Entity, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the Disclosure Statement, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the

property to be distributed under the Plan, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtor; *provided, however*, that the foregoing provisions of this exculpation shall have no effect on the liability of any Released Party that results from any such act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted gross negligence or willful misconduct. Nothing in the Plan shall affect the ability of the United States to pursue any non-Debtors to the extent allowed by non-bankruptcy law for any liabilities that may be related to any federal tax liabilities owed by the Debtor or the Debtor's Estate. Additionally, the United States may pursue police and regulatory actions or proceedings with respect to the Released Parties in the manner, and by the administrative or judicial tribunals, in which the United States could have pursued such actions or proceedings as if this bankruptcy had never been commenced.

8.      *Term Of Bankruptcy Injunction Or Stays*

Except as provided otherwise in the Plan, from and after the Effective Date, the automatic stay of section 362(a) of the Bankruptcy Code shall terminate.

9.      *Post-Confirmation Date Retention Of Professionals*

Upon the Confirmation Date, any requirement that professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate and the Reorganized Debtor will employ and pay professionals in the ordinary course of business.

## I.      Procedures For Resolving And Treating Disputed Claims And Interests

1.      *Disputed Claims And Interests*

All Disputed Claims against the Debtor or Disputed Interests in the Debtor shall be subject to the provisions of Article X of the Plan.

2.      *Objection Deadline*

Unless otherwise ordered by the Bankruptcy Court, objections to Claims or Interests shall be filed with the Bankruptcy Court and served upon the Holders of each such Claim or Interest to which objections are made on or before the Claims Objection Deadline. If an objection to a Claim or Interest is timely filed, a subsequent amendment to the objection shall also be deemed timely, even if filed subsequent to the deadline for filing the original Claim objection, and even if the amendment raises facts or legal theories not raised in the original Claim objection.

3.      *Prosecution Of Objections*

After the Confirmation Date, the Debtor or the Reorganized Debtor, as the case may be, shall have the authority to file, litigate to final judgment, settle, or withdraw objections to Disputed Claims.

4. *No Distributions Pending Allowance*

No payments or distributions shall be made with respect to any Claim to the extent it is a Disputed Claim unless and until all objections to such Disputed Claim are resolved and such Disputed Claim becomes an Allowed Claim in whole or in part.

## J. Retention Of Jurisdiction

1. *Retention Of Jurisdiction*

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction (unless otherwise indicated) over all matters arising in, arising out of, and/or related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)     Resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor or Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(b)     Decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date (which jurisdiction shall be non-exclusive as to any such non-core matters);

(c)     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

(d)     Resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to the Plan, or any entity's rights arising from or obligations incurred in connection with the Plan or such documents;

(e)     Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

(f)     Hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 503(b), and 1129(a)(4) of the Bankruptcy Code; *provided, however*, that from and after the Confirmation Date the payment of fees and expenses by the Reorganized Debtor, including professional fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(g)     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation, or enforcement of the Plan or the Confirmation Order;

(h)     Adjudicate controversies arising out of the administration of the Estate or the implementation of the Plan;

(i)     Resolve any cases, controversies, suits, or disputes that may arise in connection with General Unsecured Claims, including without limitation, the Bar Date, related notice, claim objections, allowance, disallowance, estimation and distribution;

(j)     Hear and determine Causes of Action by or on behalf of the Debtor or the Reorganized Debtor;

(k)     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked, or vacated, or distributions pursuant to the Plan are enjoined or stayed;

(l)     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

(m)     Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case;

(n)     Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code; and

(o)     Enter an order closing the Chapter 11 Case.

**K.     Miscellaneous Provisions**

1.     *Payment Of Statutory Fees*

All fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid on the earlier of when due or the Effective Date.

2.     *Amendment Or Modification Of The Plan*

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, the Debtor reserves the right to alter, amend, or modify the Plan at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan. A Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of such Holder.

3.    *Severability Of Plan Provisions*

If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

4.    *Successors And Assigns.*

The Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor. The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity.

5.    *Revocation, Withdrawal, Or Non-Consummation*

The Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file other plans of reorganization. If the Debtor revokes or withdraws the Plan, or if Confirmation or consummation of the Plan does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Class of Claims), assumption of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor or any other Person, (ii) prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor, or (iii) constitute an admission of any sort by the Debtor or any other Person.

6.    *Governing Law*

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an Exhibit or schedule to the Plan or document contained in the Plan Supplement provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of New York without giving effect to the principles of conflicts of law of such jurisdiction.

## IV.    RISK FACTORS TO BE CONSIDERED

Parties in interest should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan. This information, however, does not describe the only risks involved in connection with the Plan and its implementation.

### A.    Failure To Confirm The Plan

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Case will continue rather than be converted to a chapter 7 liquidation. The Bankruptcy Court, which sits as a court of equity, may exercise substantial discretion with respect to the affairs of the Debtor during its Chapter 11 Case. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan and requires, among other things, that the value of distributions to dissenting creditors and shareholders not be less than the value of distributions such creditors and shareholders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtor believes that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Although the Debtor believes that the Effective Date will occur shortly after the Confirmation Date, there can be no assurance as to such timing. The Debtor could experience material adverse changes in its liquidity as a result of such delay.

### B.    Potential Adverse Effects Of Chapter 11

Although the Debtor seeks to make its stay in chapter 11 as brief as possible and to obtain relief from the Bankruptcy Court so as to minimize any potential disruption to its business operations, it is possible that the commencement of the Chapter 11 Case could materially adversely affect the relationship among the Debtor and its tenants, vendors and service providers.

### C.    No Assurance Of Ultimate Recoveries; Uncertainty Of Financial Projections

1.    *No Assurance Of Ultimate Recoveries*

There can be no assurances of the actual recoveries to the Debtor's claimholders. The Debtor cannot assure its claimholders that they will be able to resell any consideration received in respect of their claims at current values or at all.

2.    *Inherent Uncertainty Of Debtor's Financial Projections*

Section VII.A below includes financial projections covering the Reorganized Debtor's operations. These projections are based on assumptions that are an integral part of the projections, including confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtor, industry performance, general business and economic conditions and other matters, many of which are beyond the control of the Reorganized Debtor and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Reorganized Debtor's operations. These variations may be material and may adversely affect the ability of the Reorganized Debtor to make payments with respect to its indebtedness. Because the actual results achieved may vary from projected results, perhaps significantly, the projections should not be relied upon as a guaranty or other assurance of the actual results that will occur.

The business plan was developed by the Debtor. There can be no assurances that the Debtor's business plan will not change, perhaps materially, as a result of decisions management and the new board of directors make after fully evaluating the strategic direction of the Debtor and its business plan. Any deviations from the Debtor's existing business plan would necessarily cause a deviation from the attached projections, and could result in materially different outcomes from those projected.

D.      **Business And Operational Risks**

   1.      *Real Estate Market Conditions*

The overwhelming majority of the Debtor's assets consists of real property.  The value of its real property and the revenue from related development activities may be adversely affected by a number of factors, including: (i) the local and national economic climate; (ii) local real estate conditions (such as oversupply of space or a reduction in demand for real estate in an area); (iii) attractiveness of the properties to prospective purchasers and tenants; (iv) increased construction costs, project difficulties or delays; (v) government regulations and changes in real estate, environmental, zoning or tax laws; (vi) interest rate levels and the availability of financing for buyers; and (vii) potential liabilities under environmental and other laws.

   2.      *Debt Agreements And Instruments Contain Restrictive Covenants*

The Amended and Restated Secured Credit Facility may impose certain restrictions on the Debtor. These restrictions may limit the Debtor.  The Debtor may need to seek permission from its lenders in order to engage in certain corporate actions.  The interests of the Debtor's lenders may be different from its own and the Debtor cannot guarantee that it will be able to obtain the permission of its lenders when needed.  Restrictions on the Debtor's ability to engage in such corporate actions may have an adverse effect on the Debtor's liquidity, operations and financial performance.

E.      **Legal and Regulatory Risks**

   1.      *Litigation*

The Debtor is, from time to time, subject to various asserted or unasserted legal proceedings and claims.  Any such claims, regardless of merit, could be time-consuming and expensive to defend and could divert management's attention and resources.  While management believes the Debtor has adequate insurance coverage and accrued loss contingencies for all known matters that are probable and can be reasonably estimated, the Debtor cannot ensure that the outcome of all current or future litigation will not have a material adverse effect on the Debtor and its results of operations.

F.      **Classification And Treatment Of Claims And Interests**

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against and Interests in the Debtor.  The Bankruptcy Code also provides that, except for certain Claims classified for administrative convenience, the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtor believes that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtor currently anticipates that it would seek to (i) modify the Plan to provide for whatever classification might be required for confirmation and (ii) use the acceptances received from any creditor pursuant to the solicitation for the purpose of obtaining the approval of the Class or Classes of which such creditor ultimately is deemed to be a member.  Any such reclassification of creditors, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such creditor was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was

inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification without requiring the Debtor to resolicit votes.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtor believes that it has complied with this requirement. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan or the Debtor could be required to modify the Plan.

## V.    CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain U.S. federal income tax consequences of the Plan to (i) U.S. Holders (as defined below) of allowed Secured Credit Facility Claims and (ii) U.S. Holders and Non-U.S. Holders (as defined below) of allowed General Unsecured Claims that are entitled to vote to accept or reject the Plan. This summary is for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), U.S. Treasury regulations promulgated thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described herein. No opinion of counsel has been obtained as to any of the tax consequences of the Plan and no ruling will be sought from the Internal Revenue Service ("IRS") with respect to any statement or conclusion in this summary. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any creditor or equity interest-holder and there can be no assurance that the IRS would not assert, or that a court would not sustain, positions different from those discussed herein.

The following discussion does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation applicable to special classes of taxpayers (including, without limitation, banks and certain other financial institutions, insurance companies, tax-exempt organizations, governmental entities, partnerships or other pass-through entities, real estate investment trusts, real estate mortgage investment conduits, regulated investment companies, controlled foreign corporations, passive foreign investment companies, persons whose functional currency is not the U.S. dollar, dealers subject to the mark-to-market rules of Section 475 of the Tax Code and cash method taxpayers holding Allowed Claims in respect of services performed or goods provided). This summary assumes that the applicable Allowed Claims are held as capital assets for U.S. federal income tax purposes, that the Tranche A Note and the Tranche B Note will each be held as a capital asset for U.S. federal income tax purposes and that none of the Secured Credit Facility Claims, the Tranche A Note and the Tranche B Note is or will be at the Effective Date considered "publicly traded" under applicable Treasury regulations. Furthermore, the following discussion does not address U.S. federal taxes other than income taxes (including, without limitation, estate and gift taxes). U.S. Holders and Non-U.S. Holders should consult their tax advisors regarding the tax consequences to them of the transactions contemplated by the Plan, including U.S. federal, state, local and foreign tax consequences.

For purposes of this discussion, a "U.S. Holder" is a beneficial holder of applicable Allowed Claims that is, for U.S. federal income tax purposes (1) an individual that is a citizen or resident of the United States, (2) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia, (3) an estate, the income of which is subject to U.S. federal income taxation regardless of its source, or (4) a trust if (i) a court within the United States is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all of the substantial decisions of such trust or (ii) such trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person. A "Non-U.S. Holder" is a beneficial holder (other than any entity treated as a partnership for U.S. federal income tax purposes) of applicable Allowed Claims that is not a U.S. Holder.

If a partnership (including any entity treated as a partnership for U.S. federal income tax purposes) holds applicable Allowed Claims, the U.S. federal income tax consequences to the partners of such partnership will depend on the activities of the partnership and the status of the partners. A partnership considering participating in the Plan should consult its tax advisor regarding the consequences to the partnership and its partners of the Plan.

**A.**    **Certain U.S. Federal Income Tax Consequences To U.S. Holders**

The discussion below describes certain U.S. federal income tax consequences of the transactions contemplated by the Plan to U.S. Holders of allowed Secured Credit Facility Claims and allowed General Unsecured Claims; however, no assurance can be given as to the treatment of such transactions by the IRS or as to whether such treatment will be sustained by a court. Each U.S. Holder should consult its tax advisor regarding the tax consequences to it of the transactions contemplated by the Plan and information that may be relevant to its particular situation and circumstances.

1.    *U.S. Holders Of Class 3 Secured Credit Facility Claims*

(a)    General

Pursuant to the Plan, in full satisfaction and discharge of its Allowed Claim, each U.S. Holder of an allowed Secured Credit Facility Claim will receive in exchange for (i) the outstanding principal amount of such Secured Credit Facility Claim and (ii) the amount of any accrued but unpaid interest on such Claim, its pro rata share of the Tranche A Note and the Tranche B Note under the Amended and Restated Secured Credit Facility (the "Credit Facility Exchange"). The Reorganized Debtor intends to report, for U.S. federal income tax purposes, the treatment of the Credit Facility Exchange as described below. The IRS could take the position, however, that the Credit Facility Exchange, the U.S. Holders, and/or the Debtor should be treated for U.S. federal income tax purposes in some manner other than that set forth below.

(b)    The Credit Facility Exchange

The U.S. federal income tax consequences of the Credit Facility Exchange will depend, in part, on whether the U.S. Holders' allowed Secured Credit Facility Claims, the Tranche A Note and the Tranche B Note constitute debt "securities" for U.S. federal income tax purposes. The Debtor and the holders of the Secured Credit Facility Claims have treated the Secured Credit Facility Claims as debt obligations of REIT for U.S. federal income tax purposes. Whether a debt instrument constitutes a "security" is determined based on all the facts and circumstances. Most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are other factors that may be relevant to the determination, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into equity of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued. In addition, under a revenue ruling issued by the IRS, under certain circumstances the term of a debt instrument received in a reorganization in exchange for another debt instrument may be considered to include the term of the original debt instrument for purposes of determining whether the newly received debt instrument is a security. The allowed Secured Credit Facility Claims have terms of approximately eight years and a quarter. There can be no assurance that U.S. Holders' allowed Secured Credit Facility Claims, the Tranche A Note and the Tranche B Note constitute debt "securities" for U.S. federal income tax purposes and each U.S. Holder should consult its tax advisor regarding the treatment of such obligations as debt "securities."

The Debtor intends to take the position, and the remainder of this summary assumes, that each of the allowed Secured Credit Facility Claims, the Tranche A Note and the Tranche B Note should constitute debt "securities" of REIT for U.S. federal income tax purposes.

(i)        Treatment As A Debt Recapitalization

Subject to the discussion below regarding accrued interest, to the extent that for U.S. federal income tax purposes a U.S. Holder's allowed Secured Credit Facility Claim is characterized as a debt "security" of REIT and the Tranche B Note is characterized as indebtedness of REIT, the Credit Facility Exchange should be treated for U.S. federal income tax purposes as a "recapitalization" by REIT, and the Tranche A Note and the Tranche B Note should also be characterized as "securities" of REIT for U.S. federal income tax purposes. If the Credit Facility Exchange is treated as a recapitalization, a U.S. Holder of an allowed Secured Credit Facility Claim generally should not recognize gain or loss on the exchange of an allowed Secured Facility Claim for the holder's pro rata share of the Tranche A Note and the Tranche B Note pursuant to the Credit Facility Exchange. A U.S. Holder's aggregate tax basis in the Tranche A Note and the Tranche B Note it receives in the Credit Facility Exchange should equal the tax basis of such U.S. Holder's allowed Secured Credit Facility Claim surrendered in exchange therefor, and such basis should be allocated among the Tranche A Note and the Tranche B Note received in the same ratio as their relative fair market values. Such U.S. Holder's holding period for such Tranche A Note and Tranche B Note should include the holder's holding period for the allowed Secured Credit Facility Claim surrendered in exchange therefor.

Subject to the discussion below regarding accrued interest, if the Credit Facility Exchange is treated as a "recapitalization," but the Tranche B Note is characterized for U.S. federal income tax purposes as a debt obligation of REIT that does not constitute a "security," a U.S. Holder generally should recognize gain (but not loss) with respect to an allowed Secured Credit Facility Claim surrendered pursuant to the Credit Facility Exchange in an amount equal to the lesser of (i) the excess of (a) the sum of the stated principal amounts of the holder's pro rata share of each of the Tranche A Note and the Tranche B Note received in the Credit Facility Exchange over (b) the U.S. Holder's adjusted tax basis in the allowed Secured Credit Facility Claim immediately prior to the exchange, and (ii) the fair market value of the holder's pro rata share of the Tranche B Note received in the Credit Facility Exchange. Except to the extent described below with respect to the "market discount" rules, any such gain recognized should be treated as capital gain and should be long-term capital gain if the U.S. Holder's holding period for its surrendered allowed Secured Credit Facility Claim exceeded one year. The U.S. Holder's initial tax basis in the Tranche A Note received pursuant to the Credit Facility Exchange should equal the tax basis of the allowed Secured Credit Facility Claim surrendered in exchange therefor, increased by the amount of any gain recognized in respect of such Secured Credit Facility Claim, and decreased by the fair market value of the Tranche B Note received in the Credit Facility Exchange. The U.S. Holder's holding period for the Tranche A Note received pursuant to the Credit Facility Exchange should include the holder's holding period for the allowed Secured Credit Facility Claim surrendered in exchange therefor. The U.S. Holder's tax basis in the Tranche B Note received pursuant to the Credit Facility Exchange should equal the fair market value of such Tranche B Note. The U.S. Holder's holding period for the Tranche B Note received pursuant to the Credit Facility Exchange should begin on the day following the Effective Date.

(ii)        Treatment As A Partner Equity Conversion

It is possible that the Tranche B Note could be characterized for U.S. federal income tax purposes as an equity interest in the Reorganized Debtor. In that case, the Reorganized Debtor would become a regarded entity for U.S. federal income tax purposes, and a U.S. Holder surrendering an allowed Secured Credit Facility Claim in exchange for the holder's pro rata share of the Tranche A Note and the Tranche B Note pursuant to the Credit Facility Exchange would be deemed for U.S. federal income tax purposes to: (i) exchange the allowed Secured Credit Facility Claim for (a) the holder's pro rata share of the Tranche A Note received in the Credit Facility Exchange and (b) a portion of the Reorganized Debtor's assets (such portion, the "Contributed Assets") having a fair market value equal to the stated principal amount of the holder's pro rata share of the Tranche B Note received in the

Credit Facility Exchange (such exchange, the "REIT Exchange"), and then (ii) transfer the Contributed Assets to the Reorganized Debtor in exchange for the Tranche B Note.

Consequently, subject to the discussion below regarding accrued interest, a U.S. Holder that is deemed to surrender an allowed Secured Credit Facility Claim in exchange for the holder's pro rata share of the Tranche A Note and the Contributed Assets pursuant to the REIT Exchange generally should recognize gain or loss equal to the difference between (i) the sum of (a) the stated principal amount of the holder's pro rata share of the Tranche A Note received in the Credit Facility Exchange and (b) the fair market value of the Contributed Assets, which should equal the stated principal amount of the holder's pro rata share of the Tranche B Note received in the Credit Facility Exchange, and (ii) the U.S. Holder's adjusted tax basis in the allowed Secured Credit Facility Claim immediately prior to the exchange. Such gain or loss should be capital gain or loss (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the U.S. Holder's holding period for its surrendered allowed Secured Credit Facility Claim exceeded one year. The U.S. Holder's initial tax basis in each of the Tranche A Note and the Contributed Assets received pursuant to the REIT Exchange should equal their respective fair market values. The U.S. Holder's holding period for the Tranche A Note and the Contributed Assets received pursuant to the REIT Exchange should begin on the day following the Effective Date.

Each U.S. Holder exchanging its allowed Secured Credit Facility Claim pursuant to the Credit Facility Exchange should consult its tax advisor regarding the tax consequences to it if the Tranche B Note were to be characterized as an equity interest for U.S. federal income tax purposes, including the tax consequences of holding a partnership interest in Reorganized Debtor for U.S. federal income tax purposes.

(c)    Accrued Interest

To the extent that any consideration is allocated to accrued but unpaid interest, such amount should be excluded from the U.S. Holder's amount realized for purposes of determining capital gain or loss and should instead be taxed as ordinary income to the extent it has not yet been included in such Holder's gross income. Pursuant to the Plan, the Reorganized Debtor will allocate for U.S. federal income tax purposes the Tranche A Note and the Tranche B Note first to the principal amount of the allowed Secured Credit Facility Claim surrendered in exchange therefor and second to any accrued but unpaid interest on such Claim. No assurance can be given that the IRS will not challenge such allocation. Consequently, a U.S. Holder may be entitled to claim a loss to the extent of any accrued but unpaid interest on such Secured Credit Facility Claim that was previously included in the holder's gross income in excess of the amount of the Tranche A Note and the Tranche B Note so allocated to accrued but unpaid interest, if any. U.S. Holders should consult their tax advisors regarding the particular U.S. federal income tax consequences applicable to them under the Plan in respect of allowed Secured Credit Facility Claims for accrued interest, including the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income.

(d)    Market Discount

A U.S. Holder that purchased its allowed Secured Credit Facility Claim from a prior holder at a discount to the then-adjusted issue price of such allowed Secured Credit Facility Claim may be subject to the market discount rules of the Tax Code. Under those rules, assuming such U.S. Holder has not made an election to amortize the market discount into income on a current basis, any gain recognized on the exchange of such allowed Secured Credit Facility Claim (subject to a de minimis rule and exceptions for certain nonrecognition transactions) generally would be characterized as ordinary income to the extent of the accrued market discount on such allowed Secured Credit Facility Claim as of the Effective Date. U.S. Holders of allowed Secured Credit Facility Claims should consult their tax advisors as to the tax consequences of the market discount rules, including, without limitation, the possible application of such rules, on the Credit Facility Exchange.

2.      *U.S. Holders Of Class 4 General Unsecured Claims*

(a)      General

Pursuant to the Plan, in full satisfaction and discharge of its Allowed Claim, each U.S. Holder of allowed General Unsecured Claims will receive the amount of such General Unsecured Claim, including interest accrued through the Petition Date, on the later of (i) the ninetieth day after the Effective Date or (ii) the first Business Day after the ninetieth day after the Effective Date on which such Claim is Allowed (the "General Unsecured Claims Exchange").

(b)      The General Unsecured Claims Exchange

Subject to the discussion below regarding accrued interest, the satisfaction of an allowed General Unsecured Claim pursuant to the General Unsecured Claims Exchange by a U.S. Holder should be fully taxable and the holder generally should recognize gain or loss equal to the difference between (i) the amount of cash received (other than cash received in respect of pre-petition accrued and unpaid interest) and (ii) such U.S. Holder's tax basis in such allowed General Unsecured Claim. Such gain or loss should be capital gain or loss (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the U.S. Holder's holding period for its allowed General Unsecured Claim exceeded one year.

(c)      Accrued Interest

Any consideration that is allocated to accrued but unpaid interest, including cash received in respect of pre-petition accrued and unpaid interest, should be excluded from the U.S. Holder's amount realized for purposes of determining capital gain or loss and should instead be taxed as ordinary income to the extent it has not yet been included in such Holder's gross income. Pursuant to the Plan, the Reorganized Debtor will not allocate for U.S. federal income tax purposes any distribution in respect of any allowed General Unsecured Claim to post-petition accrued but unpaid interest. No assurance can be given that the IRS will not challenge such allocation. Consequently, a U.S. Holder may be entitled to claim a loss to the extent of any accrued but unpaid interest on such Allowed Claim that was previously included in the holder's gross income in excess of the cash payment made in respect of pre-petition accrued and unpaid interest. U.S. Holders should consult their tax advisors regarding the particular U.S. federal income tax consequences applicable to them under the Plan in respect of allowed General Unsecured Claims for accrued interest, including the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income.

(d)      Market Discount

If an allowed General Unsecured Claim is characterized as a debt obligation for U.S. federal income tax purposes, a U.S. Holder that purchased its allowed General Unsecured Claim from a prior holder at a discount to the then-adjusted issue price of such allowed General Unsecured Claim may be subject to the market discount rules of the Tax Code. Under those rules, assuming such U.S. Holder has not made an election to amortize the market discount into income on a current basis, any gain recognized on the exchange of such allowed General Unsecured Claim (subject to a de minimis rule and exceptions for certain nonrecognition transactions) generally would be characterized as ordinary income to the extent of the accrued market discount on such allowed General Unsecured Claim as of the Effective Date. U.S. Holders of allowed General Unsecured Claims should consult their tax advisors as to the tax consequences of the market discount rules, including, without limitation, the possible application of such rules, on the General Unsecured Claims Exchange.

B.        **Certain U.S. Federal Income Tax Consequences To Non-U.S. Holders**

1.       *General*

Except with respect to payment of accrued but unpaid interest or accrued market discount, which will be taxable as described in the paragraph below, a Non-U.S. Holder of a General Unsecured Claim generally should not be subject to U.S. federal income or withholding tax on any gain recognized pursuant to the General Unsecured Claims Exchange unless (i) such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States (and, if a tax treaty applies, the Non-U.S. Holder maintains a U.S. permanent establishment to which the gain is attributable) or (ii) such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition, and certain other conditions are met. Non-U.S. Holders of allowed General Unsecured Claims should consult their tax advisors regarding the U.S. federal tax consequences of any gain recognized pursuant to the General Unsecured Claims Exchange.

2.       *Accrued Interest*

All payments of accrued but unpaid interest on the allowed General Unsecured Claims to a Non-U.S. Holder, and any gain attributable to accrued market discount recognized by a Non-U.S. Holder, pursuant to the General Unsecured Claims Exchange, generally should be exempt from U.S. federal income and withholding tax, provided that: (i) (a) such Non-U.S. Holder does not own, actually or constructively, 10% or more of the total combined voting power of all classes of stock of REIT entitled to vote, (b) such Non-U.S. Holder is not a controlled foreign corporation related, directly or indirectly, to REIT through stock ownership, (c) such Non-U.S. Holder is not a bank receiving certain types of interest, (d) the beneficial owner of the allowed General Unsecured Claim certifies, under penalties of perjury, on IRS Form W-8BEN-E or IRS Form-W-8BEN, as applicable (or appropriate substitute form) that it is not a U.S. person and certain other certification requirements are satisfied, and (ii) such accrued interest or accrued market discount is not effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States (or, if a tax treaty applies, the Non-U.S. Holder does not maintain a U.S. permanent establishment to which the accrued interest or accrued market discount is attributable).

If a Non-U.S. Holder cannot satisfy the requirements described in clause (i) above but does satisfy the requirements described in clause (ii) above, payments of accrued interest or accrued market discount on the allowed General Unsecured Claims may still be exempt from, or subject to a reduced, U.S. federal withholding tax pursuant to an applicable income tax treaty, assuming certain other certification requirements are satisfied.

Non-U.S. Holders of allowed General Unsecured Claims should consult their tax advisors regarding the U.S. federal tax consequences of any payments of accrued interest or accrued market discount pursuant to the General Unsecured Claims Exchange.

C.        **Importance Of Obtaining Professional Tax Assistance**

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM OR U.S. HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, U.S. HOLDERS OF CLAIMS SHOULD CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

## VI.   APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS

**A.   Issuance And Resale Of Plan Securities Under The Plan Pursuant To Section 4(a)(2)**

The Plan provides for the Reorganized Debtor to issue Preferred Equity Interests on account of the Equity Investment.  The Debtor believes that the Preferred Equity Interests constitute "securities," as defined in section 2(a)(1) of the Securities Act of 1933, as amended, section 101 of the Bankruptcy Code, and applicable Blue Sky Law.

1.   *Exemption From Registration*

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act.  Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under section 4(a)(2) of the Securities Act.

The Debtor believes that the Preferred Equity Interests are issuable without registration under the Securities Act in reliance upon the exemption from registration provided under section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder.  These interests will be subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable law, as described below.

2.   *Resales Of Preferred Equity Interests*

Because the Preferred Equity Interests will not be issued pursuant to section 1145(a)(1) of the Bankruptcy Code, they will be deemed "restricted securities" that may not be offered, sold, exchanged, assigned or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available.  The Debtor does not plan to register the Preferred Equity Interests.  Recipients of the Preferred Equity Interests will not be permitted to offer, sell or otherwise transfer their Preferred Equity Interests except pursuant to registration or an available exemption from registration.  The Preferred Equity Interests will be issued in certificated form and will bear a restrictive legend. Each certificate representing, or issued in exchange for or upon the transfer, sale or assignment of, any Preferred Equity Interests shall be stamped or otherwise imprinted with a legend in substantially the following form:

**"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR AN EXEMPTION THEREUNDER."**

The Reorganized Debtor will reserve the right to require certification or other evidence of compliance with the Securities Act and the applicable state securities laws as a condition to the removal of such legend or to any resale of the Preferred Equity Interests.  The Reorganized Debtor will also reserve the right to stop the transfer of any of the Preferred Equity Interests if such transfer is not in compliance with the Securities Act and the applicable state securities laws.  Any Person that purchases the Preferred Equity Interests pursuant to the Plan will be deemed to acknowledge and agree not to resell such securities except in accordance with registration or an exemption of registration, and that the securities will be subject to the other restrictions described above.

Any Persons receiving "restricted securities" under the Plan should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

## VII.    FEASIBILITY, VALUATION, BEST INTERESTS OF CREDITORS AND CONFIRMATION WITHOUT ACCEPTANCE OF ALL IMPAIRED CLASSES

### A.    Feasibility Of The Plan

The Bankruptcy Code requires that the Bankruptcy Court determine that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor. For purposes of showing that the Plan meets this "feasibility" standard, the Debtor has analyzed the ability of the Reorganized Debtor to meet its obligations under the Plan and retain sufficient liquidity and capital resources to conduct its business. To support its belief in the feasibility of the Plan, the Debtor prepared the financial projections (the "Financial Projections") set forth below. The Financial Projections show that the Reorganized Debtor should have sufficient cash to make payments required under the Plan. Accordingly, the Debtor believes the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

| Year # | 1 | 2 | 3 | 4 | Total |
|---|---|---|---|---|---|
| Net Operating Income | $ 5,545,996 | $ 6,719,228 | $ 13,071,291 | $ 15,347,821 | $ 40,684,336 |
| Capital Expenditures | (11,953,306) | (22,718,289) | (11,180,632) | (3,531,844) | (49,384,071) |
| Cash Flow before Debt Service | (6,407,310) | (15,999,061) | 1,890,659 | 11,815,977 | (8,699,735) |
| | | | | | |
| A Note Interest | (3,150,000) | (3,150,000) | (3,150,000) | (3,150,000) | (12,600,000) |
| Cash Flow after Debt Service | (9,557,310) | (19,149,061) | (1,259,341) | 8,665,977 | (21,299,735) |
| Advance from Escrow | 11,302,575 | 19,149,061 | 6,230,083 | - | 36,681,719 |
| Cash Flow after Escrow Advance | $ 1,745,265 | $ - | $ 4,970,742 | $ 8,665,977 | $ 15,381,984 |
| | | | | | |
| **Escrow Account** | | | | | |
| *Beginning Escrow Balance* | $ 10,000,000 | $ 9,110,479 | $ - | $ 4,970,742 | $ 24,081,221 |
| | | | | | |
| Advance from Borrower | 10,000,000 | 10,038,582 | 6,230,083 | - | 26,268,665 |
| Advance from Operations | 1,745,265 | - | 4,970,742 | 8,665,977 | 15,381,984 |
| | | | | | |
| Reduction, Funding to Operations | (11,302,575) | (19,149,061) | (6,230,083) | - | (36,681,719) |
| Reduction, Lender Mod Fee | (1,332,211) | - | - | - | (1,332,211) |
| Reduction, Advance to Waterfall | - | - | - | (13,636,719) | (13,636,719) |
| *Ending Escrow Balance* | $ 9,110,479 | $ - | $ 4,970,742 | $ - | $ 14,081,221 |
| | | | | | |
| **Waterfall** | | | | | |
| Net Sales Proceeds | $ - | $ - | $ - | $ 237,047,433 | $ 237,047,433 |
| Plus Ending Escrow Balance | - | - | - | 13,636,719 | 13,636,719 |
| Total Proceeds to be Distributed | - | - | - | 250,684,152 | 250,684,152 |
| | | | | | |
| A Note Payment | - | - | - | (90,000,000) | (90,000,000) |
| Preferred Equity Return | - | - | - | (34,391,936) | (34,391,936) |
| B Note Split to Borrower | - | - | - | (16,319,120) | (16,319,120) |
| B Note Payment to Lender (Principal) | - | - | - | (92,475,011) | (92,475,011) |
| Remainder Split to Borrower | - | - | - | (17,498,085) | (17,498,085) |
| Remainder Split to Lender | - | - | - | - | - |
| Total Distributed | $ - | $ - | $ - | $ (250,684,152) | $ (250,684,152) |

| Lender Recovery | | |
|---|---|---|
| A-Note | $ | 90,000,000 |
| Interest during term | $ | 12,600,000 |
| Deferred Interest - Up Front | | moved to B |
| Deferred Interest - Waterfall | | moved to B |
| B-Note (85% split with Borrower) | $ | 73,723,800 |
| B-Note Deferred Interest | $ | 18,751,211 |
| Remainder | $ | - |
| **Total Recovery, excluding interest** | $ | 163,723,800 |
| **% of Loan Recovered** | | 100.0% |

excludes interest amounts in red above

THE FINANCIAL PROJECTIONS ARE BY THEIR NATURE FORWARD LOOKING, AND ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THE INFORMATION SET FORTH THEREIN. ACCORDINGLY, READERS OF THIS DISCLOSURE STATEMENT ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON THE FINANCIAL PROJECTIONS, AND SHOULD CAREFULLY REVIEW **SECTION IV — "RISK FACTORS TO BE CONSIDERED"** HEREIN. THE FINANCIAL PROJECTIONS SHOULD NOT BE RELIED UPON AS NECESSARILY INDICATIVE OF FUTURE, ACTUAL RECOVERIES.

Holders of Claims against and Interests in the Debtor are advised that the Financial Projections were not prepared with a view toward compliance with the published guidelines of the American Institute of Certified Public Accountants or any other regulatory or professional agency or body or generally accepted accounting principles. Furthermore, the Debtor's independent certified public accountants have not compiled or examined the Financial Projections and accordingly do not express any opinion or any other form of assurance with respect thereto and assume no responsibility for the Financial Projections.

The Financial Projections assume that (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material change in legislation or regulations, or the administration thereof, that will have an unexpected effect on the operations of the Reorganized Debtor, and (iii) there will be no material contingent or unliquidated litigation or indemnity claims applicable to the Reorganized Debtor. Although considered reasonable by the Debtor as of the date hereof, unanticipated events and circumstances occurring after the preparation of the Financial Projections may affect actual recoveries under the Plan.

The Debtor does not intend to update or otherwise revise the Financial Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtor does not intend to update or revise the Financial Projections to reflect changes in general economic or industry conditions.

## B.     Best Interests Test

Under the Bankruptcy Code, confirmation of a plan also requires a finding that, with respect to each impaired class of Claims and Interests, each holder of an Allowed Claim or Interest in such impaired class has accepted the Plan, or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code ("Chapter 7"). This requirement is known as the "best interests of creditors" test (referred to herein as the "Best Interests Test").

In determining whether the Best Interests Test has been met, the first step is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtor's assets under Chapter 7. The Debtor has valued each property under a hypothetical liquidation scenario (the "Liquidation Values") and as a going

concern, and identified such values in the Portfolio Valuation attached hereto as <u>Appendix C</u>.  The Liquidation Values reflect the estimated cash proceeds, net of liquidation-related costs, that would be available to the Debtor's creditors if the Debtor were to be liquidated under Chapter 7 as an alternative to continued operation of the Debtor's business under the Plan.  Accordingly, Liquidation Values may be different than going-concern values reflected in the Portfolio Valuation and elsewhere in the Plan and in this Disclosure Statement.

The Debtor believes that the Plan meets the Best Interests Test. After analyzing the effect that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution, the Debtor, in consultation with its advisors, believes that the distributions under the Plan will be at least as much as under a Chapter 7 liquidation. The Debtor believes that any liquidation analysis in this case is highly speculative given the nature of the Debtor's assets.  However, based on the Liquidation Values, the Debtor believes that in a Chapter 7 liquidation the net proceeds of any sale would be less than the value provided under the Plan.

The Liquidation Values and the conclusion that the going concern value would be higher than a liquidation value can be attributed to the following factors, among others:  (i) the increased costs and expenses of liquidation under chapter 7, including the fees payable to the chapter 7 trustee and the attorneys and advisors to such trustee, (ii) current vacancy rates of the Portfolio, (iii) the near term tenant rollover in the Portfolio, and (iv) the likelihood that the sale prices achieved in the "forced sale" atmosphere of a chapter 7 liquidation, particularly given current market constraints, would be significantly lower than the value which may be realized through the operation or sale of the Portfolio as a going concern.

Although the Debtor believes that the Plan meets the Best Interests Test, there can be no assurance that the Bankruptcy Court will determine that the Plan meets this test.

## C.    Confirmation Without Acceptance Of All Impaired Classes

Classes 3, 4, 5, and 6 are impaired and entitled to vote on the Plan.  To the extent any of these Classes vote to reject the Plan, the Debtor will seek confirmation of the Plan pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.  Under section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm a plan over the objection of an impaired rejecting class, if, among other things, at least one impaired class of Claims has accepted the plan (not counting the votes of any "insiders" as defined in the Bankruptcy Code) and if the plan does not "discriminate unfairly" against and is "fair and equitable" to each impaired rejecting class.

In general, a plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated substantially equivalently with respect to other classes of equal rank.  Courts will take into account a number of factors in determining whether a plan discriminates unfairly, including whether the discrimination has a reasonable basis, whether the debtor can carry out a plan without such discrimination, whether such discrimination is proposed in good faith, and the treatment of the class discriminated against.  Courts have also held that it is appropriate to classify unsecured creditors separately if the differences in classification are in the best interest of the creditors, foster reorganization efforts, do not violate the absolute priority rule, and do not needlessly increase the number of classes.

A plan is fair and equitable as to a class of secured claims that rejects a plan if the plan provides that (i) the claimants in such class of secured claims retain their liens and receive deferred cash payments totaling their allowed claims; (ii) the collateral of claimants in such class of secured claims be sold with liens attaching to the proceeds of the sale; or (iii) the claimants in such class of secured claims receive the indubitable equivalent of their secured claim.  A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides (a) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.  A plan is fair and equitable as to a class of equity interests that rejects a plan if

the plan provides (a) that each holder of an interest included in the rejecting class receives or retains on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) that the holder of any interest that is junior to the interests of such class will not receive or retain any property at all on account of such junior interest under the plan.   The Debtor submits that the Plan is structured such that it does not "discriminate unfairly" and is "fair and equitable" to each impaired rejecting class.

## VIII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtor could attempt to formulate and propose a different plan or plans of reorganization.  Such a plan or plans might involve either a reorganization and continuation of the Debtor's business or an orderly liquidation of assets.

## IX.    CONCLUSION AND RECOMMENDATION

The Debtor believes that confirmation and implementation of the Plan is preferable to any other alternative under the circumstances.  Other alternatives would involve significant delay, uncertainty, substantial additional administrative costs, and lower recoveries to the holders of impaired claims and interests.  Consequently, the Debtor urges all holders of impaired claims and interests entitled to vote under the Bankruptcy Code to vote to accept the Plan and to evidence their acceptance by duly completing and returning their ballots so that they will be received on or before 4:00 P.M. (prevailing Central time) on [●], 2015 by the Voting Agent.

Dated: July 21, 2015

CRP-2 Holdings AA, L.P.

By: _____
Name: Neil Waisnor
Title:   Vice President of Colony Realty
            Partners GP II, LLC

Joseph Frank
Frances Gecker
FrankGecker LLP
325 N. Lasalle St.
Suite 625
Chicago, Illinois 60654
(312) 276-1400
jfrank@fgllp.com
fgecker@fgllp.com

Counsel for CRP-2 Holdings AA, L.P.