UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

------------------------------------x
                                    :
In re:                              :    Chapter 11
                                    :
CRP-2 Holdings AA, L.P.,            :    Case No. 15-24683 (DRC)
                                    :
        Debtor.[1]                  :
                                    :
------------------------------------x

**DECLARATION OF AMANDA STRONG, VICE PRESIDENT OF COLONY REALTY
PARTNERS GP II, LLC,
IN SUPPORT OF THE DEBTOR'S
CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Amanda Strong, hereby declare under penalty of perjury:

1. I am Vice President of Colony Realty Partners GP II, LLC ("Colony Realty"), which, through a series of intermediate entities, controls CRP-2 Holdings AA, L.P., a Delaware limited partnership formed in May of 2006 (the "Debtor").

2. I submit this declaration (the "Declaration") in support of the Debtor's (a) voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and (b) various motions filed concurrently herewith, including various "first day" motions (collectively, the "First Day Motions"). I am over the age of 18, competent to testify, and authorized to submit this Declaration in support of the Debtor's chapter 11 petition and the First Day Motions described herein.

3. As Vice President of Colony Realty, I am familiar with the Debtor's day-to-day operations, financial condition, business affairs, and books and records. Except as

---

[1] The last four digits of the Debtor's taxpayer identification number are 3709. The location of the Debtor's corporate headquarters is Two International Place, Suite 2500-AA, Boston, MA 02110.

{CRP2/001/00043278.DOCX/}

otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtor's management, including the other investment professionals at Colony Realty, or the Debtor's advisors, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration.

4. This Declaration is divided into three parts. Part I of this Declaration provides an overview of the Debtor's business and operations, including its corporate and capital structure. Part II describes the circumstances leading to the commencement of this chapter 11 case. Part III sets forth the relevant facts in support of the Debtor's First Day Motions.

## PART I: THE DEBTOR'S BUSINESS AND OPERATIONS

A.    **The Chapter 11 Filing**

5. On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to manage and operate its business as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this case.

B.    **Overview of the Debtor's Business and Corporate Organization**

6. The Debtor was formed in May of 2006 for the primary purpose of acquiring and managing real property. CRP-2 Holdings GP-AA, LLC (the "General Partner") is the general partner of the Debtor. CRP-2 Holdings 2, LLC (the "Limited Partner") is the limited partner of the Debtor. A corporate organization chart is attached as Exhibit A hereto.

7. Between May and October of 2006, the Debtor acquired fourteen properties for a total purchase price of $286,732,400, financing approximately 60% of the purchase price with proceeds from the Secured Credit Facility (defined below). Following the

acquisition, the Debtor made substantial additional equity investments in the fourteen properties, substantially increasing cost basis therein. As described below, the Debtor sold four of those properties in 2012 and 2014, using the proceeds to pay off a portion of the principal outstanding under the Secured Credit Facility and to fund a cash reserve controlled by the lender that was established to fund the cash requirements of the remaining Subject Properties (defined below).

8. As of the Petition Date, the Debtor owns ten properties (each a "Subject Property" and collectively, the "Portfolio") consisting in the aggregate of six office buildings and twenty-six industrial buildings located in and around Chicago, Washington D.C., Boston, and New Jersey. The following table contains further details regarding the Portfolio as of March 31, 2015:

| Subject Property | # of Buildings | Building Type | Cost Basis | Location |
| --- | --- | --- | --- | --- |
| Corporate Lakes III | 1 | Office | $28.1 million | Lisle, Illinois |
| Highland Atrium | 1 | Office | $10.1 million | Downers Grove, Illinois |
| 1800 Alexander Bell | 1 | Office | $40.7 million | Reston, Virginia |
| 12902 Federal Systems | 1 | Office | $66.1 million | Fairfax, Virginia |
| 371 Hoes Lane | 1 | Office | $19.9 million | Piscataway, New Jersey |
| Reservoir Corporate Center | 1 | Office | $21.6 million | Southborough, Massachusetts |
| CIW – Carol Stream Portfolio | 2 | Industrial/Flex | $5.0 million | Carol Stream, Illinois |
| CIW – Elgin Portfolio | 8 | Industrial/Flex | $29.9 million | Elgin, Illinois |
| CIW – Naperville Portfolio | 5 | Industrial/Flex | $21.9 million | Naperville, Illinois |
| Chicago Infill Portfolio | 11 | Industrial/Flex | $33.0 million | Chicago Area, Illinois |

9. The Debtor's cost basis in the Portfolio as of March 31, 2015 is $276,182,500. As indicated in the Portfolio Valuation attached as Appendix C to the disclosure statement filed concurrently herewith, the Subject Properties were most recently appraised by independent, third-party appraisers in the second and third quarters of 2014 at approximately $170,000,000, which included $9,389,000 of cash in an escrow (the "Working Capital Escrow") required under the terms of the Secured Credit Facility. The Debtor estimates that as of June 30, 2015, the Working Capital Escrow account held a total of $10,893,700 in cash.

C.    **Pre-Petition Capital Structure**

10.    In August 2006, in connection with purchasing the Portfolio, the Debtor obtained financing from JPMorgan Chase Bank, N.A. (the "Original Lender") in the original principal amount of $171,360,000 (the "Secured Credit Facility"). To evidence the Secured Credit Facility, the Debtor and the Original Lender entered into that certain Amended and Restated Loan Agreement dated as of November 30, 2006 (as amended or modified from time to time, the "Existing Credit Agreement" and together with any other related documents pertaining to the Secured Credit Facility, the "Secured Credit Facility Documents"). The Secured Credit Facility was divided into three tranches (each a "Sub Note") with staggered maturities in 2011, 2013, and 2014, respectively.

11.    As security for payment and performance of the Debtor's obligations in connection with the Secured Credit Facility (the "Secured Obligations"), the Debtor granted to the Original Lender security interests in the Portfolio. Each Sub Note was secured by a separate collateral pool comprised of specified Subject Properties. Pursuant to the Secured Credit Facility Documents, full payoff of a Sub Note releases the associated Subject Properties from the collateral pool. The 2011 Sub Note was secured by: (i) 12902 Federal Systems, (ii) Corporate Lakes III, (iii) 371 Hoes Lane, and (iv) an industrial property in Houston that has since been sold. The 2013 Sub Note was secured by (i) CIW – Elgin Portfolio, (ii) Reservoir Corporate Center, (iii) CIW – Naperville Portfolio, (iv) Highland Atrium, and (v) CIW – Carol Stream Portfolio. The 2014 Sub Note was secured by (i) 1800 Alexander Bell, (ii) Chicago Infill Portfolio, and (iii) additional properties in Texas and Georgia that have since been sold.

12.    To further secure payment and performance of the Secured Obligations, the Debtor executed, acknowledged and delivered to the Original Lender certain assignments entitled Amended and Restated Assignment of Leases and Rents dated November 30, 2006. In

addition, with respect to each Subject Property, the Debtor entered into certain lockbox and cash management agreements (collectively, the "Lockbox Agreements"). Pursuant to the Existing Credit Agreement and the Lockbox Agreements, the Debtor (i) agreed to deposit or cause to be deposited rents and other income received by or on behalf of the Debtor into applicable lockbox accounts and (ii) granted the Original Lender a first priority security interest in such lockbox accounts.

13. Through a series of assignments of the Secured Credit Facility, U.S. Bank National Association ("U.S. Bank" or the "Lender") became, and remains, the owner and holder of all right, title and interest in and to the Secured Credit Facility.

14. The Debtor and U.S. Bank entered into the Modification Agreement (described below) in 2012. Pursuant to the Modification Agreement, the Debtor invested an additional $8,500,000 into the Portfolio to pay expenses of the Modification Agreement and seed the Working Capital Escrow (to be used for leasing costs and building improvements), and the parties agreed to extend the initial maturity date of each Sub Note to December 1, 2014. Under the Modification Agreement, the Debtor has the option to further extend the maturity date of each Sub Note to December 1, 2015 and, subsequently, to December 1, 2016 upon the conditions described therein. The Debtor has not exercised these options. In addition, pursuant to the Modification Agreement, each Sub-Note was collateralized by the entire Portfolio so that, in effect, there is now a single loan secured by the entire Portfolio.

15. As of July 1, 2015, the outstanding balance of the Secured Obligations is equal to approximately $163,000,000, which includes all unpaid principal, deferred interest, charges and fees as asserted by the Lender through April 1, 2015 and additional current and default interest that accrued on the loan from April 1, 2015 through June 30, 2015. The Debtor

has no other secured debt outstanding as of the Petition Date. As of July 14, 2015, the Debtor has approximately $1,300,000 in unpaid taxes and $1,400,000 in other unsecured debt, comprised of trade credit incurred in the ordinary course of the Debtor's business.

16. As noted above, the Subject Properties were appraised by independent, third-party appraisers in the second and third quarters of 2014 at a value equal to approximately $170,000,000, which included a $9,389,000 cash balance in the Working Capital Escrow. The Debtor estimates the current fair value of the Portfolio to be at least equal to this amount. This amount exceeds all of the Debtor's debt by several million dollars. Moreover, as further described below, the Debtor believes there is significant, additional equity value in the Portfolio. The Debtor's owners are confident enough in this value that, as described further below, they are prepared to infuse a minimum of $10,000,000 in additional equity into the Debtor and its operations, with additional possible investments of up to $30,000,000 in their sole and absolute discretion. With this commitment of $10,000,000 in new equity, the Debtor believes the value of the Reorganized Debtor will be approximately $180,000,000 at a minimum.

## PART II: EVENTS LEADING TO THE CHAPTER 11 CASE

*(a) The Global Recession and Local Real Estate Downturn*

17. The global recession and attendant downturn in the United States real estate market from 2007 through 2009 has strained the Debtor's balance sheet and ability to service its debt. During this period, rental rates decreased nationwide, financing for real estate transactions dried up, and capitalization rates increased. Since 2009, the recovery in real estate has been uneven, with strong recoveries in various coastal cities, but slower recoveries for areas in which the Subject Properties are located. In particular, as a result of lagging job growth, the Chicago real estate market has been slow to rebound. In addition, although government stimulus programs enabled the Washington D.C. metro area to initially recover quickly, subsequent

political uncertainty around the 2012 presidential election, government gridlock, and the 2013 government sequester had deleterious effects on that market.

*(b) Increase in Vacancy Rates*

18. As a result of these and other factors, vacancy rates for the Debtor's portfolio have increased in recent years, contributing to a decline in the Debtor's earnings and liquidity position. Notably, in January 2010, IBM exited 12902 Federal Systems as part of a corporate level consolidation. Due to the state of the market in the surrounding D.C. metro area, the Debtor temporarily delayed a significant repositioning effort with respect to this property. As projections for this market have improved since 2014, the Debtor has invested significant capital in the asset. However, 12902 Federal Systems, the largest single asset in the portfolio, remains entirely vacant. Similarly, other assets have struggled in the wake of the global recession as tenants have vacated or downsized and have not yet been fully replaced. For example, at the end of 2013, a major tenant at Highland Atrium filed for bankruptcy and vacated the premises. As a result of these and other developments, the Debtor's portfolio was 68% occupied as of June 30, 2015, as compared to an average 88% occupancy at the time of acquisition. The table below shows the square footage of each property and its occupancy.

| Subject Property | Type | Square Feet | Occupancy | Location |
|---|---|---|---|---|
| Corporate Lakes III | Office | 124,327 | 64% | Lisle, Illinois |
| Highland Atrium | Office | 68,251 | 71% | Downers Grove, Illinois |
| 1800 Alexander Bell | Office | 138,475 | 76% | Reston, Virginia |
| 12902 Federal Systems | Office | 210,993 | 0% | Fairfax, Virginia |
| 371 Hoes Lane | Office | 139,454 | 88% | Piscataway, New Jersey |
| Reservoir Corporate Center | Office | 99,853 | 100% | Southborough, Massachusetts |
| CIW – Carol Stream Portfolio | Industrial/Flex | 64,285 | 22% | Carol Stream, Illinois |
| CIW – Elgin Portfolio | Industrial/Flex | 245,882 | 61% | Elgin, Illinois |
| CIW – Naperville Portfolio | Industrial/Flex | 162,065 | 68% | Naperville, Illinois |
| Chicago Infill Portfolio | Industrial/Flex | 513,264 | 92% | Chicago Area, Illinois |

*(c) The Previous Portfolio Restructuring*

19.     In the summer of 2011, due to the Debtor's strained liquidity position and the pending maturity of the 2011 Sub Note—which was collateralized by the fully vacant 12902 Federal Systems—the Debtor initiated negotiations to restructure the Secured Credit Facility. Ultimately, after protracted negotiations, the Debtor and U.S. Bank entered into a loan modification agreement (the "Modification Agreement"), effective as of August 1, 2012. The Modification Agreement extended the initial maturity date of the entire Secured Credit Facility to December 1, 2014; provided the Debtor with an option to further extend it upon certain terms and conditions; and provided for each Sub Note to be collateralized by the entire Portfolio. In connection with the restructuring, the Debtor immediately invested an additional $8.5 million in new equity into the Portfolio and agreed to sell Subject Properties and use the proceeds from such sales to make required principal payments of the Secured Credit Facility and use excess proceeds to further fund the Working Capital Escrow for future leasing costs and building improvements.

*(D) The Debtor's Default*

20.     Subsequent to this debt restructuring, the performance of the Portfolio continued to lag as Virginia and Chicago remained troubled markets, among other factors. In 2012 and 2014, the Debtor sold Subject Properties in Texas and Georgia, using sale proceeds of $36.2 million to repay $27.2 million of principal and to fund $9.0 million into the Working Capital Escrow as required under the modified terms of the Secured Credit Facility. Further, the Debtor invested $1.7 million into the Portfolio during 2014 to cover monthly interest payments coming due prior to maturity.

21. On September 19, 2014, the Debtor delivered a request (the "Transfer Request") to Midland Loan Servicing, Inc., master servicer of the loan, to transfer the servicing of the loan to the special servicer. The Transfer Request included notice that the Debtor would be unable to refinance the loan or meet the required terms of the first extension per the Modification Agreement, and the loan was therefore facing imminent default. In October 2014, the loan was transferred to CWCapital Asset Management LLC ("CWCAM"), special servicer on behalf of U.S. Bank. As contemplated by the Transfer Request, the Debtor did not exercise the extension option, and defaulted on the December 1, 2014 maturity payment.

22. On December 9, 2014 and December 15, 2014, U.S. Bank sent default notices to the Debtor demanding immediate payment in full of the entire outstanding balance of the Secured Credit Facility. In addition, on December 15, 2014, Midland Loan Services, as servicer under the Modification Agreement, notified the Debtor that it would cause the transfer of all monies in the lockbox accounts into U.S. Bank's cash management accounts. U.S. Bank sent an additional default notice to the Debtor on April 1, 2015 and, the next day, filed a complaint (the "Complaint") in the United States District Court for the Southern District of New York seeking to appoint a receiver to manage the Portfolio. On June 3, 2015, the Debtor filed a motion to dismiss the Complaint for lack of subject matter jurisdiction. On June 23, 2015, U.S. Bank voluntarily dismissed the matter.

23. On April 23, 2015, the Debtor executed a Pre-Negotiation Agreement (the "PNA") under which the Debtor and CWCAM would agree to commence discussions regarding a potential loan modification or work-out. The PNA came after many months of discussions between representatives of the Debtor and representatives of CWCAM. These discussions continued after execution of the PNA, during which the parties met at CWCAM's office and

{CRP2/001/00043278.DOCX/}                                  9

subsequently exchanged several proposals for a consensual restructuring of the Secured Credit Facility that included, among other things, a significant cash infusion by the Debtor's owners.

24. Ultimately, these negotiations proved unsuccessful. Accordingly, the Debtor determined that this chapter 11 filing was a necessary step to preserve the going concern value of its business and maximize the value of the Portfolio, including the value of its equity. As noted above, based on the most recent appraisal of the Subject Properties, the Debtor believes that the fair value of the Portfolio exceeds the outstanding amount of the Secured Credit Facility and all other outstanding debts of the Debtor. However, due to the Portfolio's current vacancy rates and pending lease expirations at a number of the Subject Properties, the Debtor believes that sales of these Subject Properties at this time would yield depressed prices that would not pay all debt in full. Accordingly, the Debtor, through this chapter 11 filing, seeks to extend the maturity of the Secured Credit Facility, continue to manage the Portfolio as a going-concern, and maximize value for all constituents.

25. Contemporaneously herewith, the Debtor has filed the Plan of Reorganization of CRP-2 Holdings AA, L.P. Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan") and the Disclosure Statement with respect to the Plan (the "Disclosure Statement"). Significantly, the Plan contemplates payment in full of all creditors, including the outstanding obligations under the Secured Credit Facility described above. In order to support the Plan and the Debtor's turnaround, and as evidence of the Debtor's belief in the equity value of the Portfolio, the Debtor's owners are prepared to contribute $10 million to the Debtor on the effective date of the Plan to fund various reserves for tenant leasing costs and building improvements that will enhance the value of the Portfolio and that will also be used to pay an up-front fee to the Lender of $750,000. Moreover, the Debtor's equity owners are prepared to

invest up to an additional $30 million in the Debtor, in their sole and absolute discretion, during the term of the restructured Secured Credit Facility.

26. I believe that the Plan is fair and equitable to the Lender, and is in the best interests of the Debtor's estate, creditors, equity owners, and all parties-in-interest and should be confirmed.

### PART III: FIRST DAY MOTIONS AND ORDERS

27. Concurrently with the filing of the chapter 11 case, the Debtor has filed the following motions and, at the "first day" hearing, will seek orders approving the First Day Motions and associated proposed orders (collectively, the "First Day Orders"), each as listed on the attached Exhibit B, and respectfully requests that the Court consider entering the proposed orders granting such First Day Motions.[2] I have reviewed each of the First Day Motions and First Day Orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief. Moreover, I believe that the relief sought in each of the First Day Motions and First Day Orders is vital to the Debtor's ability to transition to, and operate in, chapter 11 with minimum interruption or disruption to its business and resulting loss of value.

**A.    Cash Management Motion**

28. The Debtor requests entry of interim and final orders (a) authorizing the Debtor to continue using its existing cash management system, bank accounts, and business forms, subject to any changes that the Debtor may make thereto in its sole discretion, and (b) waiving any applicable investment and deposit requirements imposed by section 345(b) of the

---

[2] Any term not defined herein has the meaning ascribed to it in the specific First Day Motion being described.

Bankruptcy Code or otherwise. The Debtor also requests that the Court schedule a final hearing on the Motion within forty-five (45) days of entry of the Interim Order.

29. The Debtor maintains ten lockbox accounts (collectively, the "Lockbox Accounts") for the collection of rents and other receivables. The Debtor has maintained the Lockbox Accounts with JPMorgan Chase ("JPMorgan") for over eight years. JPMorgan is a large diversified financial services institution with FDIC coverage (up to an applicable limit per account).

30. The Lockbox Accounts are swept by the Lender on a daily basis, and these swept funds accumulate in a bank account controlled by the Lender (the "Lender-Controlled Account"). Monies swept from the Lockbox Accounts belong to the Debtor, and are held in trust by the Lender. On a monthly basis, the Lender advances monies from the Lender-Controlled Account to concentration accounts (the "Concentration Accounts") which are maintained by Colony Realty Partners II REIT, a non-debtor affiliate. Colony Realty Partners II REIT in turn advances monies to the Debtor's operating accounts (the "Operating Accounts") to fund the costs and expenses of the Debtor. The Lockbox Accounts, Concentration Accounts, and Operating Accounts (collectively, the "Bank Accounts") constitute a centralized cash management system that the Debtor uses for the collection of its receivables and payment of costs and expenses.

31. In my opinion, requiring the Debtor to alter its banking and business practices, including its use of numerous business forms and its existing books and records, would cause disruption in the Debtor's business and would impair the Debtor's efforts to focus on its chapter 11 proceedings and pursue options to maximize the value of its estate. Moreover, such actions would be expensive, unnecessary and burdensome to the Debtor's estate and disruptive to the Debtor's business operations and would not confer any benefit upon those dealing with the

Debtor. Consequently, I believe that maintenance of the existing cash management system and other banking and business practices during this chapter 11 case is in the best interests of all creditors and other parties in interest.

32. To the extent the cash management system and related practices do not comply with the requirements of section 345(b) of the Bankruptcy Code, I believe the Debtor has shown sufficient cause to waive compliance with those requirements for forty-five (45) days. As stated above, the Lockbox Accounts are held at a FDIC-insured financially stable banking institution. To the extent that such deposits do not conform with the approved practices identified in section 345 of the Bankruptcy Code, the Debtor seeks to have such requirements waived for forty-five (45) days so as to allow the applicable banks to accept and hold the Debtor's funds consistent with prepetition practices.

**B.    Cash Collateral Motion**

33. The Debtor requests entry of interim and final orders pursuant to sections 105, 361, 362, 363, 507(b) and 552 of the Bankruptcy Code: (a) authorizing the Debtor's use of cash collateral ("Cash Collateral"); (b) granting certain adequate protection; (c) modifying the automatic stay to permit the Debtor to implement the terms of any orders approving the cash collateral motion; and (d) scheduling a final hearing for entry of an order authorizing and granting the relief requested in the cash collateral motion on a final basis.

34. The Debtor has an immediate need to use Cash Collateral to continue to operate and pay restructuring costs associated with this chapter 11 case. The Debtor's access to the Cash Collateral therefore is necessary to ensure that the Debtor has sufficient working capital and liquidity to operate and thus preserve and maintain the value of the Debtor's estate.

35. The Debtor believes that the Lender will be adequately protected for the use of the Cash Collateral, by: (1) the granting of superpriority administrative claims; and (2) the

granting of adequate protection liens, including replacement liens, liens on certain unencumbered property and junior liens on prepetition and postpetition property subject to existing liens.

36. For all the foregoing reasons, I believe that the relief requested in the cash collateral motion is in the best interests of the Debtor's estate and will enable the Debtor to continue to operate in chapter 11 without disruption.

**C.     Utilities Motion**

37. The Debtor is requesting that this Court enter an order (a) implementing procedures (in the form and manner discussed in the utilities motion) to provide adequate assurance of postpetition payment to the Utilities, as that term is used in section 366 of the Bankruptcy Code; (b) deeming the Utility Deposits (defined below) to constitute adequate assurance of payment to the Utilities under sections 366(b) and (c) of the Bankruptcy Code; (c) prohibiting the Utilities from altering, refusing to provide, or discontinuing service to or discriminating against the Debtor solely on the basis of the commencement of the chapter 11 case or on account of any unpaid invoice for services provided prior to the Petition Date; and (d) prohibiting a Utility from seeking additional Utility Deposits from the Debtor in the event such Utility applies a setoff of any prepetition deposit(s) against debts that arose from prepetition utility services, if any.

38. The Debtor proposes to provide each Utility with a cash deposit equal to the average monthly invoice or bill the Debtor received from such Utility as calculated over a six (6) month period prior to the Petition Date (collectively, the "Utility Deposits"). The aggregate of all such deposits will be approximately $154,472, as set forth in further detail in Group Exhibit A attached to the utilities motion.

39. The uninterrupted provision of the utility services is vital to the Debtor's operation and thus the success of the chapter 11 case. In my opinion, it is critical that utility

services continue uninterrupted during this chapter 11 case. I believe that the procedures the Debtor has proposed for the Utilities adequately protect the Utilities' rights that I have been advised are provided to the Utilities under the Bankruptcy Code, while also protecting the Debtor's need to continue to receive, for the benefit of its estate, the utility services upon which its business depends.

**D.    Bar Date Motion**

40. The Debtor seeks entry of an order (a) establishing deadlines for filing proofs of claim, and (b) approving the form and manner of notice thereof. It is essential for the Debtor to ascertain quickly the full nature, extent and scope of claims asserted against the estate. The Debtor has filed its Plan and Disclosure Statement concurrently herewith. The Debtor wishes to seek confirmation of its Plan as expeditiously as possible and needs to ascertain the prepetition liabilities asserted by the Debtor's creditors in order to ensure that the Plan appropriately classifies and addresses these claims. Accordingly, I believe it is essential that claims are asserted by the earliest deadline possible. Therefore, the Debtor requests that the Court set September 18, 2015 as the deadline for all persons and entities, other than governmental units, to file proofs of claim, which deadline is more than eight weeks after the entry of the order for relief, and January 18, 2016 as the bar date for governmental units.

**E.    Schedules and Statements Motion**

41. The Debtor is requesting that the Court extend the time by which the Debtor must file its schedules of assets and liabilities and statements of financial affairs ("Schedules and Statements") through and including August 19, 2015. No creditor or other party in interest will be prejudiced by the requested extension of time for the filing of the Schedules and Statements.

## F. Solicitation Motion

42. The Debtor is requesting the Court enter an order (i) setting a combined hearing (the "Combined Hearing") on the adequacy of the Disclosure Statement and on confirmation of the Plan; (ii) establishing voting and objection deadlines; (iii) approving solicitation and voting procedures; (iv) approving the proposed forms of ballots and notice of non-voting status; and (v) approving the proposed form of notice of the Combined Hearing and the deadlines for voting and objection.

43. I believe that setting a Combined Hearing will significantly expedite this process, reduce the number of notices to be provided to creditors, and reduce administrative expenses incurred during the course of the Debtor's chapter 11 case.

44. I am informed that a Combined Hearing will not prejudice the Debtor's creditors or other parties in interest. I believe that creditors and other parties in interest will maintain a meaningful opportunity to challenge the adequacy of the Disclosure Statement at the Combined Hearing. Therefore, the Debtor requests that the Court conduct a Combined Hearing in lieu of a separate hearing on the adequacy of the Disclosure statement.

45. I am informed that the Disclosure Statement contains adequate information sufficient to satisfy the requirements of section 1125 of the Bankruptcy Code. Specifically, the Disclosure Statement contains substantial information regarding the circumstances leading the Debtor into bankruptcy, the classification and treatment of claims and interests, and the means for implementation of the Plan.

46. I am further informed that the Combined Hearing Notice and the proposed manner of service of the Combined Hearing Notice and the other solicitation materials comply with the applicable Bankruptcy Rules and are appropriate under the circumstances of the

Debtor's case. I believe that the voting procedures will result in the greatest possible participation in voting, and will not prejudice the Debtor's creditors and other parties in interest.

I swear under penalty of perjury that the foregoing is true and correct.

Dated: July 20, 2015

By: _____
Name: Amanda Strong
Title: Vice President of Colony Realty Partners GP II, LLC