# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CRP-2 HOLDINGS AA, L.P., | ) | Case No. 15-24683 |
| | ) | |
| Debtor. | ) | |
| | ) | Hon. Donald R. Cassling |
| | ) | |
| | ) | **Hearing Date: February 9, 2016** |
| | ) | **Hearing Time: 9:30 a.m. CT** |

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on **Tuesday**, **February 9, 2016, at 9:30 a.m.,** or as soon thereafter as counsel may be heard, we shall appear before the Honorable Donald R. Cassling, Room 619, United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, or before such other judge as may be sitting in his place and stead, and then and there present the attached *Motion to Dismiss Bankruptcy Case Pursuant to 11 U.S.C. § 1112(b)*, at which time and place you may appear as you see fit.

Dated: January 14, 2016

    U.S. Bank, National Association, in its capacity as trustee for the registered holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2006-LDP9, Commercial Mortgage Pass-Through Certificates, Series 2006-LDP9, by and through CWCapital Asset Management LLC, solely in its capacity as Special Servicer

    By:   /s/ Christopher Combest
          One of its attorneys

Christopher Combest
Quarles & Brady LLP
300 North LaSalle Street, Suite 4000
Chicago, IL 60654
Telephone: (312) 715-5000

## CERTIFICATE OF SERVICE

I, Christopher Combest, an attorney, hereby certify that, on January 14, 2016, I caused the *Motion to Dismiss Bankruptcy Case Pursuant to 11 U.S.C. § 1112(b)* (the "Motion"), along with the preceding Notice, to be filed electronically, via the Court's CM/ECF System, and thereby to be served upon the parties listed below, to whom the System

automatically delivered an electronic copy of each such filing at the following electronic mail addresses:

- Michael A Brandess    mbrandess@SugarFGH.com
- John J Conway    johnconway@shlawfirm.com
- Joseph D Frank    jfrank@fgllp.com, ccarpenter@fgllp.com;jkleinman@fgllp.com
- Jonathan P Friedland    jfriedland@sugarfgh.com, bkdocket@sugarfgh.com;plove@sugarfgh.com
- Frances Gecker    fgecker@fgllp.com, csmith@fgllp.com
- Matthew J. Goldberg    mgoldberg@brglawgroup.com, jrichman@brglawgroup.com
- Aaron L. Hammer    ahammer@sugarfgh.com, chorvay@sugarfgh.com;mbrandess@sugarfgh.com;joconnor@sugarfgh.com;mmelickian@sugarfgh.com;bkdocket@sugarfgh.com;dmadden@sugarfgh.com
- Reed A Heiligman    rheiligman@fgllp.com, ccarpenter@fgllp.com;mmatlock@fgllp.com
- Jeremy C Kleinman    jkleinman@fgllp.com, ccarpenter@fgllp.com;mmatlock@fgllp.com
- Patrick S Layng    USTPRegion11.ES.ECF@usdoj.gov
- Mark Melickian    mmelickian@SugarFGH.com, ahammer@sugarfgh.com;joconnor@sugarfgh.com;mbrandess@sugarfgh.com;bkdocket@sugarfgh.com
- Renu Shah    renu.shah@skadden.com, chdocket@skadden.com;wendy.lamanna@skadden.com;annie.li@skadden.com
- Charles S. Stahl, Jr.    cstahl@smbtrials.com, pcanington@smbtrials.com
- Elizabeth B Vandesteeg    evandesteeg@sugarfgh.com, plove@sugarfgh.com

    I further certify that, on January 14, 2016, I caused the Motion and the above Notice to be served via first-class U.S. Mail, postage prepaid, upon the following:


Leah Eisenberg
Arent Fox LLP
1675 Broadway
New York, NY 10019


Dated: January 14, 2016                        By:   /s/ Christopher Combest
                                                              Christopher Combest

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| CRP-2 HOLDINGS AA, L.P., | ) | Case No. 15-24683 |
| | ) | |
| Debtor. | ) | Honorable Donald R. Cassling |
| | ) | |
| | ) | **Hearing Date: February 9, 2016** |
| | ) | **Hearing Time: 9:30 a.m. CT** |

**MOTION TO DISMISS BANKRUPTCY CASE PURSUANT TO 11 U.S.C. § 1112(b)**

U.S. Bank, National Association, in its capacity as trustee for the registered holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2006-LDP9, Commercial Mortgage Pass-Through Certificates, Series 2006-LDP9 (the "Trust"), by and through CWCapital Asset Management LLC, solely in its capacity as Special Servicer ("CWCAM"), hereby submits this motion (the "Motion") requesting that the Court dismiss the above-captioned Chapter 11 bankruptcy case (the "Bankruptcy Case") of the debtor CRP-2 Holdings AA, L.P. (the "Debtor"). This Motion is supported by the following and by the record before the Court.

**I.    PRELIMINARY STATEMENT[1]**

After having been in maturity default for more than seven months, the Debtor commenced this Bankruptcy Case six months ago by filing a voluntary petition, a plan of reorganization, and a motion to set aggressive plan confirmation deadlines. Rather than immediately seeking stay relief or dismissal (and notwithstanding negotiated pre-bankruptcy waivers in which the Debtor had irrevocably consented to stay relief and a prohibition on use of cash collateral), the Trust consented to the Debtor's use of cash collateral and agreed to an

---

[1]    Capitalized terms used but not defined in the Preliminary Statement shall be defined as set forth elsewhere in this Motion.

expedited plan confirmation schedule that provided for the plan confirmation hearing to occur in mid-January 2016 – within six months of the Petition Date.

As filed, however, the Debtor's plan was patently unconfirmable. It contained only a skeleton description of the Debtor's proposed form of reorganization, under which the Debtor sought to bifurcate the secured debt owed to the Trust into an A-Note and B-Note, with the B-Note subordinated to Plan financing given by the Debtor's parent company. The Debtor belatedly realized it could not meet the deadlines set by the First Plan Scheduling Order. The Debtor then requested and received an extension of these deadlines.

As the deadline approached for the Debtor to disclose the full details of its proposed reorganization, including the treatment of the Trust's claim and the terms of the proposed Plan financing, which were to be contained in a Plan Supplement, the Debtor, without explanation, withdrew its Plan. Two months have passed since the Debtor withdrew its Plan, and it has not taken any discernible steps toward proposing a new Plan or moving this case forward. Interest, default interest, legal and expert fees, and other amounts owed to the Trust have continued to accrue, administrative costs of more than $400,000 have been sought by the Debtor and the Committee, yet the Debtor has made no forward movement in this case. It appears that the Debtor does not have the ability to propose a confirmable Plan. The continuation of the Bankruptcy Case is causing a continuing loss to the estate and to the potential recoveries to the Trust and other creditors. Accordingly, the Bankruptcy Case should be dismissed for "cause."

## II.   FACTUAL AND PROCEDURAL HISTORY

### The Loan Transaction

1. The Debtor is obligated to the Trust pursuant to a loan (the "Loan") evidenced by three promissory notes in the original aggregate principal amount of $171,360,000 (collectively,

the "Notes").  The Notes are secured by, among other things, mortgages and deeds of trusts (collectively, the "Mortgages") on property located in and around Chicago, Northern Virginia, Boston and New Jersey, consisting of six office buildings and twenty-six industrial buildings (collectively, the "Properties").  See Schedule A – Real Property [Docket No. 76]; Proof of Claim Number 38-1 filed by the Trust (the "Trust's Proof of Claim").  Pursuant to the Mortgages, the Trust holds valid and perfected first priority liens on and security interests in the Properties.  See Schedule D – Creditors Holding Secured Claims [Docket No. 76]; Trust's Proof of Claim.

       2.       The Debtor's obligations to the Trust are further secured by assignments of leases and rents (collectively, the "Rent Assignments") for each of the Properties.  See Declaration of Amanda Strong, Vice President of Colony Realty Partners GP II, LLC in Support of the Debtor's Chapter 11 Petition and First Day Motions ("Strong Declaration") [Docket No. 17], at ¶ 12; Trust's Proof of Claim.  Pursuant to the Rent Assignments, the Debtor was granted a revocable license to collect rents from the Properties (collectively, the "Rents"), which license terminated automatically upon the Debtor's default.  The Rents constitute the Trust's "Cash Collateral" as defined in Bankruptcy Code § 363.  See Debtor's Motion for Entry of Interim and Final Orders Under 11 U.S.C. §§ 105, 361, 362, 363, 507 and 552, Bankruptcy Rules 2002, 4001, 6003, 6004, 9014 and Local Rule 4001-2 (I) Authorizing the Debtor to Use Cash Collateral, (II) Granting Adequate Protection, and (III) Scheduling a Final Hearing (the "Cash Collateral Motion") [Docket No. 10], at pp. 1-2.  The Note, Mortgages, Rent Assignments, and all related loan and security documents shall be collectively referred to herein as the "Loan Documents."[2]  The Trust

---

[2] True and correct copies of the Loan Documents are attached as exhibits to the Trust's Proof of Claim and are incorporated by reference herein.

is the holder of and beneficiary under the Loan Documents.  See Strong Declaration at ¶ 13; Trust's Proof of Claim.

3. Pursuant to the Modification Agreement effective as of August 1, 2012 (the Modification Agreement"), among other things, the maturity date of the Loan was extended and the Debtor was given two additional one-year options to extend the maturity date upon the Debtor's satisfaction of certain conditions contained in the Modification Agreement, and the Notes were cross-collateralized by all of the Properties.  See Strong Declaration at ¶ 14; Trust's Proof of Claim at Exhibit 6 (Modification Agreement).  A true and correct copy of the Modification Agreement is attached hereto as **Exhibit A**.  In consideration of the Trust's agreement to modify the Loan, the Debtor irrevocably agreed that if a bankruptcy case concerning the Debtor was filed, among other things, the Trust would be entitled to (i) entry of an order granting the Trust relief from any and all stays, including the automatic stay, on or against the Trust's exercise of its rights and remedies with respect to the Property and/or the Debtor; (ii) entry of an order prohibiting the Debtor from use of any cash collateral; and (iii) a finding that no reorganization in bankruptcy was feasible.  See Ex. A, Modification Agreement at § 3.5.

### The Default and Bankruptcy Proceedings

4. The Debtor failed to meet the conditions necessary to extend the maturity date and did not exercise its option to extend the maturity of the Loan.  See Strong Declaration at ¶¶ 14 and 21.  The Loan therefore matured on December 1, 2014 (the "Maturity Date"), the Debtor did not repay the indebtedness and, accordingly, has been in continuous payment default since the Maturity Date.  See Strong Declaration at ¶ 21.  By letters dated December 9, 2014, December 15, 2014 and April 1, 2015, the Trust sent notices of default to the Debtor demanding

4

immediate payment of all outstanding amounts due.  See Strong Declaration at ¶ 22.  Pre-bankruptcy, the Trust and the Debtor engaged in extensive negotiations, but did not reach an agreement.  The Trust commenced a foreclosure action and, on July 21, 2015 (the "Petition Date") the Debtor commenced its Bankruptcy Case.

5. On the Petition Date, the Debtor also filed the Cash Collateral Motion.  The Trust and the Debtor have since entered into three consensual interim Cash Collateral orders, Docket Nos. 60, 135 and 232 (collectively, the "Cash Collateral Orders"), allowing for the consensual use of Cash Collateral to pay the operating expenses of the Properties in accordance with the terms of the Cash Collateral Orders and the agreed budgets.

6. On July 21, 2015, the Debtor filed a disclosure statement and plan of reorganization, Docket Nos. 14 and 15 (respectively, the "First Disclosure Statement" and the "First Plan").  The Debtor filed an amended disclosure statement on September 25, 2015 (the "First Amended Disclosure Statement"), [Docket No. 137].

7. After contested hearings and extensive negotiations by the Debtor and the Trust, the Court entered a detailed scheduling order on October 6, 2015 (the "First Plan Scheduling Order"), [Docket No. 157], setting Plan related deadlines including deadlines for (i) discovery, (ii) the Debtor's amendment of its First Amended Disclosure Statement and filing of its Plan Supplement (as defined in the First Plan Scheduling Order), (iii) briefing, and (iv) plan solicitation and voting.  Under the First Plan Scheduling Order, the Court scheduled a two-week plan confirmation hearing commencing on January 11, 2016.

8. On October 13, 2015, the Debtor filed its second amended disclosure statement (the "Second Amended Disclosure Statement") [Docket No. 160].  The Trust filed an objection to the Second Amended Disclosure Statement on October 16, 2015 (the "Objection to Disclosure

5

Statement"), [Docket No. 164], because, among other things, the Disclosure Statement did not contain adequate information as required by Bankruptcy Code § 1125.

9. The Debtor determined that it would not be able to comply with the deadlines set forth in the First Scheduling Order. As a result, the Trust and the Debtor negotiated extended deadlines which were approved by the Court in an order entered on November 10, 2015 (the "Second Plan Scheduling Order") [Docket No. 191]. Under the Second Order, among other things, any amendment to the Second Amended Disclosure Statement or the Plan was required to be filed by November 20, 2015; the Plan Supplement was also due by November 20, 2015 and a two-week hearing on Plan confirmation was scheduled to commence on March 7, 2016.

10. On November 17, 2015 – just days before the Plan Supplement deadline – the Debtor withdrew its Second Amended Disclosure Statement and Plan and stated that it would not seek approval of the Disclosure Statement or acceptance of the Plan. See Notice of Withdrawal [Docket No. 187].

11. In the two months since the Notice of Withdrawal was filed, the Debtor has not filed a new disclosure statement or plan or taken any other visible steps toward plan confirmation. See, generally, Docket.

12. An unsecured creditors committee (the "Committee") was appointed on August 3, 2015 and is seeking approval of its attorneys' fees and expenses through November 30, 2015 in the amount of $84,496.98. See Docket Nos. 220 and 221. Though denied by the Court, the Committee sought a carve-out from the Cash Collateral to pay the fees and expenses of its counsel. See Docket No. 219.

13. On January 12, 2016, Debtor's counsel filed its first interim fee application seeking approval and payment of $319,091.31 in fees and expenses incurred from the Petition Date through December 31, 2015 [Docket No. 244].

14. According to the Debtor's Summaries of Cash Receipts and Disbursements (collectively the "Income Summaries"), the Debtor's net income – without payment of debt service or administrative expenses such as the Debtor's attorneys' fees and expenses – totals $2,656,828.84 for the period from the Petition Date through November 30, 2015 and averages $664,207.21 per month. See Docket Nos. 131, 166, 192 and 228. The Debtor's receipts from operations have steadily declined over the course of the Bankruptcy Case and now are approximately $400,000 per month less than on the Petition Date. Compare Docket No. 131 (receipts from operations $1,621,060.34) with Docket No. 228 (receipts from operations $1,242,670.13).

15. As of July 21, 2015 (the "Petition Date"), the indebtedness owed by the Debtor to the Trust under the Loan Documents totals approximately $152 million. See Trust's Proof of Claim at 21; Strong Declaration at ¶ 15. Interest accrues at the rate of 5.5385% per annum; default interest accrues at the rate of an additional 5.00% per annum. Since the Petition Date through January 19, 2016, more than $4 million in contract rate interest and more than $4 million in default interest has accrued. As a result of the accrual of interest, default interest, legal and expert fees and other recoverable amounts, the Trust is currently owed more than $160 million.

16. According to the Debtor, the value of the Properties totals $160,401,500.00. See Schedule A.[3] The Rents are the Debtor's sole source of income. See Statement of Financial

---

[3] The Trust does not accept the Debtor's asserted value for the Properties and hereby reserves and does not waive all rights with respect to the value of the Properties, including, but not limited to the right to assert a different value for the Properties.

Affairs at ¶ 1. The Debtor does not own any property that is unencumbered by the Trust's first priority liens and security interests. See Schedules A and B.

### III.   ARGUMENT

A court has broad discretion under Bankruptcy Code § 1112(b) to dismiss a Chapter 11 case for cause. See In re Woodbrook Assocs., 19 F.3d 312, 317 (7th Cir. 1994) ("The bankruptcy court has broad discretion to dismiss a Chapter 11 case under 11 U.S.C. 1112(b)"). Bankruptcy Code § 1112(b) provides that, upon the request of a party in interest, the court shall convert or dismiss a case, absent "absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate…if the movant establishes cause."

Section 1112(b)(4) provides a non-exhaustive list of grounds for dismissal of a Chapter 11 case. See § 1112(b); see also In re Original IFC Shareholders, Inc., 317 B.R. 738, 750 (Bankr. N.D. Ill. 2004) (stating that Section 1112(b) contains a non-exhaustive list of grounds for dismissal).

### A. The Bankruptcy Case Should Be Dismissed Because the Debtor Cannot Effectuate a Plan.

A case may be dismissed at any time if it appears unlikely that the debtor will be able to effectuate a plan of reorganization. See In re Woodbrook Assocs., 19 F.3d at 317 ("A chapter 11 case can be dismissed at any time. Creditors need not wait until a debtor proposes a plan or until the debtor's exclusive right to file a plan has expired."). In this case, the Debtor filed a patently unconfirmable plan on the Petition Date and insisted upon an expedited plan confirmation process that the Debtor later extended when it realized it could not meet the deadlines imposed by the First Plan Scheduling Order.

8

QB\38098056.2

The Debtor withdrew its Plan days before it had to file the detailed documents that would govern the transactions contemplated in the Plan, including the treatment of the Trust's claim and the amount and terms of new financing, which were to be contained in a Plan Supplement. The Debtor did not give any reasons for this withdrawal. It appears likely that the Plan was withdrawn because Debtor realized that the Plan failed to meet the Bankruptcy Code's requirements for plan confirmation[4] and/or because the Debtor did not have the means to effectuate the Plan because its financing fell through or because the Debtor was relying upon the $10 million Working Capital Escrow to fund its Plan.

The Debtor withdrew its Plan approximately two months ago and has not since taken any visible steps toward proposing a new Plan. The Debtor has provided no evidence of a viable source of funding for the Plan, and it does not appear likely that the Debtor will be able to obtain Plan financing. Among other things, using the Debtor's own numbers, the equity cushion on the Property is legally insufficient to support financing contingent upon a priming lien and it is unlikely that a funding source would agree to a lien position junior to that of the Trust. Moreover, the monthly net income from the Property is insufficient to pay the operating expenses and the non-default contract interest owed to the Trust (which totals approximately $665,000 per month). The Debtor has had more than six months to propose a confirmable Plan It has not done so, and it appears that the Debtor cannot propose a confirmable Plan. Accordingly, the Bankruptcy Case should be dismissed.

---

[4] The Plan was unconfirmable because, among other things, (i) the Plan relied upon a priming lien, but there was not a sufficient equity cushion to allow for such lien and the Debtor did not appear to satisfy the other requirements for a priming lien; (ii) the Plan was not feasible in light of, among other things, the tenant and property improvements and the non-binding financing arrangement with the proposed Plan financing source; and (iii) the proposed interest rates for the A-Note and the B-Note were too low.

QB\38098056.2

### B. The Bankruptcy Case Should Be Dismissed Because There Is A Continuing Loss to the Estate and an Absence of a Reasonable Likelihood of Rehabilitation.

Section 1112(b)(4) provides that a bankruptcy case should be dismissed if there is a continuing loss to or diminution of the estate and an absence of a reasonable likelihood of rehabilitation. See § 1112(b)(4)(A); see also Original IFPC Shareholders, Inc., 317 B.R. at 742 (quoting statute). Under Section 1112(b)(4)(A), the issue is not whether the Debtor could confirm a liquidation plan, the issue is whether the Debtor can confirm a plan of reorganization that will allow the Debtor to continue to operate. See In re Vallambrosa Holdings, L.L.C., 419 B.R. 81, 89 (Bankr. S.D. Ga. 2009) ("Rehabilitation contemplates the successful maintenance or re-establishment of the debtor's business operations.") (citation and internal quotations omitted). As established above, the Debtor cannot confirm such a plan.

The filings in this case demonstrate that there is a continuing loss to and diminution of the estate. Since the Petition Date, the Debtor has incurred more than $400,000 in administrative fees and the Trust's secured claim has increased by more than $8 million. Based upon the Income Summaries filed by the Debtor, however, the Properties' cash flow through November 30, 2015 totals only $2,656,828.84. At the time the Bankruptcy Case was filed, the Debtor's own numbers show an equity cushion of approximately $8 million. Though the Trust disputes these numbers, the equity cushion envisioned by the Debtor has now been eliminated by the accrual of interest, default interest and other recoverable charges owed to the Trust, as well as the accrual of the estate's own administrative expenses. The Debtor's income has steadily declined (by approximately $400,000) over the course of the case and there is no indication that the Debtor's income will increase. See Income Summaries. Each of the foregoing facts establishes that there has been a continuing loss to and diminution of the estate. See In re Vallambrosa Holdings, L.L.C., 419 B.R. at 89 (finding that there was a continuing loss to or diminution of the

estate where, as a result of the accrual of interest owed to the secured creditor, the equity cushion was diminishing and accumulating administrative costs were further diminishing the value of the estate); Original IFPC Shareholders, 317 B.R. at 742 (finding a continuing loss to or diminution of the estate as a result of accruing administrative expenses and negative cash flow). Accordingly, the Debtor's Bankruptcy Case should be dismissed.

### C. **The Debtor's Bankruptcy Case Should Be Dismissed Because of the Pre-Bankruptcy Waivers.**

In consideration of the Trust's agreement to modify the Loan, the Debtor irrevocably agreed, among other things, that if a bankruptcy case was filed the Trust would be entitled to (i) entry of an order granting the Trust relief from any and all stays, including the automatic stay, on or against the Trust's exercise of its rights and remedies with respect to the Property and/or the Debtor; (ii) entry of an order prohibiting the Debtor from use of any cash collateral; and (iii) a finding that no reorganization in bankruptcy was feasible. See Ex. A, Modification Agreement at § 3.5.  When negotiated in connection with a loan modification, such pre-petition waivers are enforceable.  See In re 4848, LLC, 490 B.R. 343, 351 (Bankr. E.D. Wis. 2013) (noting the modern trend in favor of enforcement of such agreements and finding the pre-petition waiver enforceable and a factor in favor of granting stay relief).  Notwithstanding the pre-petition waivers contained in the Modification Agreement, the Trust agreed to the Debtor's use of cash collateral, agreed to an expedited multi-week January 2016 confirmation hearing, agreed to delay that hearing until March 2016, and has given the Debtor six months (and beyond the Debtor's period of exclusivity) to propose a confirmable plan.  The Debtor has not done so.  Without the ability to use cash collateral and/or if the Trust is granted stay relief to foreclose on the Properties under its negotiated waivers, the Debtor has no ability to reorganize and no assets to reorganize.  As a result, the Bankruptcy Case should be dismissed.

11

## IV. CONCLUSION

WHEREFORE, based upon the foregoing and the entire record before the Court, the Trust respectfully requests that the Court enter an order dismissing the Bankruptcy Case.

DATED: January 14, 2016

        U.S. Bank, National Association, in its capacity as trustee for the registered holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2006-LDP9, Commercial Mortgage Pass-Through Certificates, Series 2006-LDP9, by and through CWCapital Asset Management LLC, solely in its capacity as Special Servicer

        By:  /s/ Christopher Combest
            One of its attorneys

Gregory A. Cross (pro hac vice)
Frederick W. H. Carter (pro hac vice)
Catherine Guastello Allen (pro hac vice)
VENABLE LLP
750 East Pratt Street, Ste. 900
Baltimore, Maryland 21202
Phone: (410) 244-7446
Fax:    (410) 244-7742
gacross@venable.com
fwhcarter@venable.com
cgallen@venable.com

and

Faye B. Feinstein
Christopher Combest
QUARLES & BRADY LLP
300 N. LaSalle Street, Ste. 4000
Chicago, Illinois 60654
Phone: (312) 715-5000
Fax:    (312) 715-5155
faye.feinstein@quarles.com
christopher.combest@quarles.com

12